## WILSON *v.* TODHUNTER.

### Opinion delivered November 25, 1918.

1. CONTRACTS—CONSTRUCTION AND OPERATION—WHAT LAW GOVERNS.—Where a contract for the cultivation of lands in this State was made in Missouri, and settlements between the parties were to be made there, the contract was a Missouri contract, and its nature, validity and interpretation must be governed by the laws of that State.

2. CONTRACTS—ACTION FOR BREACH—WHAT LAW GOVERNS.—Where a suit under a Missouri contract relative to the cultivation of lands in this State has been instituted in this State, the remedy for its breach will be governed by this forum.

3. PARTNERSHIP—PARTICIPATION IN PROFITS.—Mere participation in the profits and losses of the business alone will not make the participant a partner.

4. PARTNERSHIP—INTENTION OF PARTIES.—Whether a partnership exists depends on the intention of the parties to be gathered from the contract construed in the light of all the facts and circumstances.

5. PARTNERSHIP—EXISTENCE—SUFFICIENCY OF EVIDENCE.—In an action by an alleged partner against his copartners in the farming business, evidence as to community of interest and intent to share equally in profits and losses *held* sufficient to establish the existence of a partnership.

6.  PARTNERSHIP—EXISTENCE—BURDEN OF PROOF.—Where one sues
    his alleged partners to recover payments depending on the exist-
    ence of the partnership relation, the burden is on him to prove
    its existence.

Appeal from Chicot Chancery Court; *Z. T. Wood*,
Chancellor; affirmed.

STATEMENT OF FACTS.

This suit was instituted by the appellee against the
appellants. The appellee alleged in substance that he
and his father and the appellants were tenants in common
of 2,805 acres of land in Chicot County; that when pur-
chased, the land consisted of old and abandoned fields and
woodlands; that the appellee went upon the lands to im-
prove, manage and operate same; that the owners were
to share equally in profits and losses; that the lands were
so operated until the 1st of January, 1915, when it was
agreed that the lands should be divided; that after the
lands were divided, the appellee rented about 100 acres
of the cleared lands of the appellants' for which he was
to pay the sum of $1 per acre; that the appellants were
due the appellee certain amounts for the years 1912, 1913
and 1914, which amounts are exhibited in an account set
forth in the complaint, and for the sum of $15 for an ab-
stract furnished appellants and paid for by the appellee;
that certain personal property was in the hands of the ap-
pellee belonging to the partnership, and that upon an
accounting, the appellants would be due the appellee the
sum of $2,766.85 including principal and interest to date
of suit, which amount should be credited with one-half
the personal property in appellee's hands belonging to
the partnership. Appellee prayed that the partnership
be dissolved; that after deducting one-half of the pro-
ceeds of the personal property in his hands belonging to
the partnership, that he have judgment for the balance
found due him from the appellants and that the same be
declared a lien upon their lands and that unless paid,
the lands be sold, etc.

The appellants answered admitting that they were
owners in common with the appellee by purchase of the

lands mentioned in his complaint, and that they continued as such until the year 1915. They specifically denied the allegations of the appellee's complaint that they had ever entered into a partnership agreement by which they were to share equally the profits and losses incident to the operation of the lands. They specifically denied that after the partition of the lands, that they had contracted to rent the appellee their part for the sum of $1 per acre for the years 1915 and 1916 and they set up by way of counterclaim that the appellee was indebted to them for one-half the value of certain personal property in his possession as the appellants' tenant; that the appellee occupied the lands belonging to the tenants in common in the year 1914 without any contract, and that he was due the appellants one-half of the fair rental value of the lands for that year, amounting to the sum of $345; that the appellee contracted to pay the appellants the sum of $150 as rent for their part of the lands for the year 1915; that the appellants rented to the appellee their undivided half interest in the 2,805 acres for the years 1912 and 1913 by a verbal contract, under the terms of which the appellee agreed to pay the appellants one-half of all sums he had collected off of the whole place less 20 per cent off of the first $1,000 and less 10 per cent on all sums above $1,000; that the appellee had never made a full statement to the appellants of the business for those two years although often requested so to do, and that appellants had reason to believe that the appellee was indebted to them for the business of those years; that the sum of such indebtedness could only be ascertained by appointment of a master to state an account. Appellants prayed that the master be appointed to state an account between the parties for the years of 1912 and 1913, and that they have judgment for the sum of $345, their portion of the rents for the year 1914, and $150 for the rents for the year 1915 with interest on these sums to date of the decree, and for all general and equitable relief.

It will be observed that the only issue raised by the complaint and answer is whether or not a partnership ex-

isted between the appellee and appellants in the operation of the lands purchased by them as tenants in common during the years 1912, 1913 and 1914, and if there was a partnership whether or not the appellants at the termination thereof, were indebted to the appellee in the sum for which he sued, and whether appellee was indebted to appellants for the rent of 1915. The testimony is exceedingly voluminous. We have reviewed it all, but it would unnecessarily extend this opinion to set it forth and comment upon it in detail. We shall therefore only state what we regard as the salient features of the evidence bearing upon the issue as to whether or not there was a partnership.

Ryland Todhunter testified as follows: "My son, Neill Todhunter, had charge of it in 1912, 1913 and 1914. Our arrangement was that Neill was to take charge of the land and operate it, making necessary improvements, and if the place was operated at a loss, that is, that if the expense of operation was greater than the income, each of us four, that is, Neill, the two Wilsons and myself were to bear such loss equally. If the place made a profit we were to divide that profit equally. There was a further agreement that if operated at a profit, the Wilsons were to pay Neill a per cent. of their profit to recompense him for looking after their interest. When we began operations in Arkansas the place was a wilderness. The Wilsons and myself prevailed upon Neill to take charge of the Arkansas property. He reluctantly consented to do so, as to go there he was compelled to give up a lucrative position here, in farming his land and his extensive mule business, in which he was not only making money but pleasantly and comfortably situated. He gave up his home and business and began the improvement of the place there, and under his management it has been brought from a wilderness to its present state of productiveness. He has given it all his time and I am sure his very best endeavor to make it profitable for all concerned. The situation remained the same as to the conduct of the business of the Arkansas lands during the

years from the time we started work until the property was divided, and before the division was made, in some of our conversations, they, (the Wilsons) complained about the cost of operating the place being more than the income, and that they did not want to spend any more money on it, and this attitude of theirs brought about the division of the property afterwards made.''

Neill Todhunter testified in part as follows: ''Q. What agreement if any did you have with the Wilsons as to making the improvements and developments and the cultivation and operation of same?'' A. ''Our agreement was verbal. We had an agreement that every man was to pay his part of it. S. N. Wilson one-quarter and M. D. Wilson one-quarter. Father said for me to pay his half; to take it and run it as far as he was concerned. Ryland Todhunter was my father. I paid one-half the expenses up to June 1, 1912, and the Wilsons paid the other half and it was settled up to then and they owed me a balance then of $310. There was no set time for these settlements. We settled when I went to Missouri. I took the books and we settled there.'' Again he says: ''We were to run this property, the Wilsons to pay one-half of the expenses and I was to pay the other one-half of the expenses and improvements and they were to share one-half of the proceeds of the profits and losses and I to share one-half of the profits and losses, and in addition they did promise me, I think it was 20 or 25 per cent. of their part of the net profits for my services for them, but there never was any profits those years as the boll weevil ate us up.''

The testimony on behalf of the Wilsons was substantially as follows: That in November, 1907, Neill Todhunter proposed to go to Arkansas and take charge of the plantation if each owner would pay one-quarter of his expenses and one-quarter of any cost necessary to repair some of the houses and to repair some fences on his place. This was agreed upon and Neill Todhunter went and took charge of the property. On January 30, 1907, a settlement was made with plaintiff for the 1908 rental and a

new contract was made by which it was agreed that Tod-hunter was to again look after the renting of the land for all the owners for the year 1909. It was agreed that Todhunter would rent the Wilson half of the land to the tenants who had rented the Todhunter half. Todhunter was to arrange with some merchant to guarantee to furnish provisions to those tenants who could not furnish themselves and the Wilson brothers were to stand good for one-half of any provisions guaranteed which tenants did not pay for out of their crops. It was decided about how much extra fencing was to be put up and not over two houses built if needed. Also a few mules were to be bought if tenants needed them.

On December 3, 1909, Todhunter and the Wilsons made a settlement for the rents and expenses of that year and Todhunter paid to the Wilson brothers for their half of the net earnings the sum of $102.40, but when he (Todhunter) returned to Arkansas on January 17, 1910, the Wilsons paid him $125, being more than they had received from him on January 3rd. For the year 1910 a new contract was made between the parties, the terms of which were the same as that for the year 1909, it being agreed again that one or two houses would be built if needed and such extra fencing be done as was necessary. It was agreed in the contract for 1910 that Todhunter would rent all four shares of the land to the same tenants and divide in fourths the rents collected by him for the year 1910, and if tenants had to be furnished provisions the Wilsons would pay one-half of any loss sustained thereby. They were also to pay one-half of Todhunter's expenses while he was in Arkansas. In the settlement for the year 1910, the Wilsons paid Todhunter $82 for their half of the losses.

A new contract was entered into for the year 1911 which was the same as that for the year 1910, except that Todhunter was not to buy any more mules or build any more houses than was absolutely necessary. On January 12, 1912, the parties had a settlement and the Wilsons paid to Todhunter $92.43 for

their half of the loss in the expenses of renting the land for the year 1911. Todhunter wished to continue the business as before, but the Wilsons told him they were tired of putting up for half of the losses and were not satisfied with his management, giving their reasons therefor. But finally, on January 26, 1912, the Wilsons submitted a written memorandum to the Todhunters of the terms upon which they were willing to rent the land for the year 1912. This memorandum specified certain items of expense and the amounts for which each owner was to pay one-quarter of the expense, and Neill Todhunter was to receive as his compensation for his services 20 per cent. of the first $1,000 net rents received by the four owners and 10 per cent. on all above that amount. The memorandum showing the terms of the contract for 1912 was not signed by Todhunter as the contracts for previous years were verbal and he objected to signing a written contract.

In January, 1913, the Wilsons told Todhunter that they were willing to renew the contract of January 26, 1912, without any new improvements or mules, and they told him that he must find his tenants around home and not go off to another State for them at heavy cost. Neill Todhunter stated that he would rent the place that way. The Wilsons had no contract with Neill Todhunter for the rent of the land for the year 1914. Todhunter occupied the land for that year without any contract whatever with the Wilsons and he had not offered to pay any rents for that year, nor had he at any time after January, 1913, offered to make a settlement for the year 1913 or for any other year. He had not made a settlement of the business for 1912 and 1913 or any subsequent year.

On March 27, 1914, the Wilsons registered a letter to Neill Todhunter and received a registered receipt showing that he had received the same, in which they demanded of him a settlement of the whole business transacted by him in connection with the land for the years of 1912 and 1913 and which they concluded by saying, "We have no contract with you since the crop of 1913 was

sold." On the same day they wrote to F. Weis, a merchant at Eudora who supplied the tenants on the place informing him that the Wilsons had no contract with Neill Todhunter after December 31, 1913, and would not, therefore, be responsible on any contract Neill Todhunter had made with him regarding supplies after the sale of the cotton in 1913.

*W. W. Grubbs* and *J. C. Gillison,* for appellants.

1. This was a Missouri contract and controlled by the laws of that State. 96 Ark. 446; 107 *Id.* 70.

2. No partnership ever existed. 1 Mod. Law of Partnership, Rowley, § 72-83; 172 Mo. App. 612; 176 *Id.* 383; 162 Mo. 261; 14 *Id.* 230; 22 A. & E. Enc. Law, 14, 31; 197 Mo. App. 286; 91 Ark. 26; 44 *Id.* 424; 88 Mo. 594; 41 Mo. App. 243; 33 *Id.* 494; 68 Mo. 242.

3. If a partnership existed it terminated at the expiration of 1913. A partnership may be terminated (1) by expiration of term, (2) by express will of one partner in any partnership organized for an indefinite term or at will and (3) by the express will of all partners which need not be expressed by words but may be implied by the conduct of a partner, as by discontinuance of business; by estoppel; by conduct of a partner causing injury; or by wilful or persistent breach of partnership agreement. 1 Rowley Mod. Law of Part., § § 572 to 576 and note; 22 A. & E. Enc. Law, 204-5, 210; 187 Mo. App. 430; 5 Ark. 270; 97 *Id.* 43; 41 Mo. App. 243; *Id.* 494.

4. The annual custom of making settlements at the end of the year and deciding what to be done next year is binding. 31 Ark. 113. If appellants employed appellee as their agent to manage and rent their lands which by agreement was to terminate at the end of the year, then at the expiration of such contract his contract ceased and his continuance in possession of land in which he owned a share *and from which he could not be ejected* was not a continuation of employment and any farming transactions without a new agreement would not bind them and appellee would owe reasonable rent. 37 Ark. 308; 22 A.

& E. Enc. Law 127; Kirby's Digest. If appellee was so employed as agent and it was his duty to keep accounts and at the end of the year submit to appellants a written statement of business transacted, then his failure to do so any year was a breach of duty and terminated his contract. 4 Dana (Ky.) 24; 90 Pa. St. 143.

5. The relation between the parties for 1912, 1913 and 1914 was controlled by the memorandum "C" to the deposition of S. N. Wilson of January 26, 1912. The majority members of a partnership may control and terminate matters. The partnership, if any, ceased at the end of 1913. 22 A. & E. Enc. Law, 129; 15 Mo. 425.

6. No demand for or statements made after request no interest should be allowed. In the absence of agreement no advancements bear interest. The custom of partners to charge no interest is a presumption that there was no agreement or custom to charge interest. 1 Rowley Mod. Law Par. § 668; 22 A. & E. Enc. Law, 125 and note; 51 Ark. 198; 39 *Id.* 131; 84 *Id.* 623; Rev. Stat. Mo. 1909, § 7179; 117 Mo. App. 153; 180 Mo. 754.

7. The findings of the chancellor are clearly erroneous. 31 Ark. 85; 77 *Id.* 216; 114 *Id.* 121. His findings are persuasive merely. 75 Ark. 72; 75 *Id.* 72. The court will correct any errors. 43 *Id.* 307; 42 *Id.* 522.

*H. E. Cook* and *Streett & Burnside,* for appellee.

1. A partnership was clearly established. 63 Ark. 518; 80 *Id.* 23; 87 *Id.* 412; 91 *Id.* 26; 93 *Id.* 521; 97 *Id.* 390. In the following cases a partner and employee are distinguished. 74 Ark. 437; 93 *Id.* 57; 104 *Id.* 119. The admissions of the parties establish a partnership relation. 63 Ark. 30; 93 *Id.* 301. A continuing partnership is proved by the acts and admissions of the parties and by letters.

2. The findings and decree of the chancellor are correct and sustained by the law and the evidence. 71 Ark. 605; 68 *Id.* 314; 72 *Id.* 67; 73 *Id.* 489; 67 *Id.* 200; 68 *Id.* 134.

WOOD, J., (after stating the facts). The undisputed evidence shows that the contract between the Todhunters and Wilsons for the development and cultivation of the lands in Chicot County, Arkansas, was made in Missouri and the settlements were to be made there. The contract was therefore a Missouri contract and its nature, validity and interpretation must be governed by the laws of that state. The suit having been instituted in Arkansas, the remedy for the alleged breach will be governed by this forum. *Lawler* v. *Lawler,* 107 Ark. 70; *Rock Island Plow Co.* v. *Masterson,* 96 Ark. 446-448.

The Court of Appeals of Missouri in *Graf Distilling Co.* v. *Wilson,* 172 Mo. App. 612, announces the following rules: ''Mere participation in the profits and losses of a business alone, would not make the participant a partner.'' ''Whether, in fact, a partnership exists, depends upon the intention of the parties, to be discovered from the contract into which they enter, construed in the light of all the facts and circumstances that obtain.'' *Ellis* v. *Brand,* 176 Mo. App. 384, 391, 392, 393, and cases there cited; *Goodyear Tire & Rubber Co.* v. *Ward,* 197 Mo. App. 286. The same rules obtain in this State. *Johnson* v. *Rothschilds,* 63 Ark. 518; *Rector* v. *Robins,* 74 Ark. 437, 442; *Herman Kahn & Co.* v. *Bowden,* 80 Ark. 23; *Buford* v. *Lewis,* 87 Ark. 412; *LaCotts* v. *Pike,* 91 Ark. 26; *Lewis* v. *Buford,* 93 Ark. 57, 61; *Roach* v. *Rector,* 93 Ark. 521, 526; *Beebe* v. *Olentine,* 97 Ark. 390.

Now the Todhunters in their testimony say concerning the purchase, improvement and cultivation of these lands, that a partnership existed, while on the other hand the Wilsons say that it was not the intention of the parties to create such relation. This testimony by each of them was but the statement of a legal conclusion. The undisputed facts as disclosed by the testimony of both the Todhunters and the Wilsons show that a partnership did exist, at least from the year 1907 until the year 1912. For their testimony shows that there was a community of interests between them and that their intention was to carry on the business sharing equally in the profits and

losses without any restrictions or limitations upon the partner who was managing the business as to the amount of the expeditures he should make, or as to manner in which he should conduct the business, of operating the plantation.

For the years 1912, 1913 and 1914 there is decided conflict in the evidence as to the nature of the contract under which the business was to be conducted. The testimony of the Todhunters tended to show that the contract was the same for these years as for the previous years, but the testimony of the Wilsons tended to show that Neill Todhunter was limited by them to the expenditure of a definite sum for certain specified items and that they were not to be responsible for any amount in excess of this. The burden was upon the plaintiff, Todhunter, to prove that the partnership existed for these years, and if there were no other testimony in the record than that of verbal testimony of the Todhunters and the Wilsons we would be compelled to hold that the appellee had failed to sustain his case. But there are certain facts and circumstances established by other evidence and the exhibits which convince us that the appellee has proved by a preponderance of the evidence that a partnership existed between him and the Wilsons for the years 1912, 1913 and 1914 as well as for the previous years.

The testimony of one, Fischel, who was a bookkeeper in the employ of F. Weis, a merchant from whom Todhunter purchased supplies for the tenants on the place, was to the effect that not a year passed but what one of the Wilsons visited the plantation, sometimes twice a year; that he (Wilson) was there in 1914 twice and he never objected to any of the accounts or any dealings that Todhunter had with the house in regard to the plantation until a considerable time after Todhunter had made his annual contract with Weis for that year and had incurred an expense as shown by the account filed with the complaint of $655, which was incurred in procuring labor for the plantation. Weis, however, did not furnish the

money to pay this expense. Witness was asked why the Wilson brothers should have made any objection to these accounts when Weis did not hold them responsible for it, and he stated, ''The thing was a partnership.''

The testimony of the Wilsons tended to prove that Neill Todhunter owed them a balance on the settlement for the year 1911 and for the years 1912 and 1913, and that he had paid nothing for the rent of the land for the year 1914 for which year they claimed they had no contract whatsoever with him. Yet, the record discloses that the Wilsons instituted suit against Neill Todhunter for rent of their land for the years 1915 and 1916 and had recovered a judgment against him in the sum of $300, but they had not set up any claim by suit for any amount during previous years. These are cogent circumstances tending to show that for the previous years the Wilsons recognized that Neill Todhunter had operated the plantation as a partnership enterprise.

But notwithstanding the above circumstances, even if it could be said that the testimony of the Todhunters and the Wilsons on the issue of partnrship was still in *equipoise,* it occurs to us that a letter brought into the record by an exhibit to the testimony of S. N. Wilson turns the scale on the issue of partnership for the years prior to 1915 in favor of Neill Todhunter. That letter was dated March 4, 1916, and was written to Weis and Fischel to get them to collect an account which the Wilsons claimed to be due from Todhunter for rent of land for the year 1915. In the letter S. N. Wilson, among other things, says: ''We were never able to get anything out of our land previous to last year where we farmed it jointly. We grew tired of paying out money and getting no return and divided the land. At his request we rented this land last year for $150 to Neill Todhunter and we certainly expect to collect it as it is a matter entirely separate from our partnership business prior to January, 1915.'' The above letter was written prior to any law suits between the parties and there is no escaping the conclusion at the time it was written, from the viewpoint of the Wilsons

themselves, that prior to the agreement for the partition of the land in January, 1915, and while they held the same in common, it was operated as a "partnership business."

The issue as to whether the lands were so operated during the years 1912, 1913 and 1914 for which an accounting is here sought, is a mixed one of law and fact. Having determined that issue in favor of Neill Todhunter, the only other issue is as to what amount, if any, was due the appellee by the appellants. This issue is purely one of fact. The parties expressly waived the appointment of a master to state an account and the cause is submitted on this issue on the accounts made exhibits to the pleadings and the depositions of the witnesses. It could serve no useful purpose to review the evidence on this issue of fact. It involves an examination of long accounts. From our own investigation, we are not convinced that a preponderance of the evidence shows that the findings of the chancellor are erroneous. He made findings in detail showing the losses, with interest thereon, sustained by the appellee for the years 1912, 1913 and 1914, and deducted from the aggregate sum of these amounts one-half of the amount of the personal property in appellee's hands belonging to the partnership, and also the sum of $300, the amount of rent with interest thereon found to be due from the appellee to appellants for the years 1915 and 1916, and rendered a decree in favor of the appellee for the balance.

We are unable to say from our examination of the record that these findings are not correct. The decree is, therefore, affirmed.