GUARDIAN LIFE INSURANCE COMPANY *v.* DIXON.

Opinion delivered March 27, 1922.

1. EVIDENCE—PRESUMPTION AGAINST SUICIDE.—The presumption against suicide stands until overthrown.

2. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—To disturb a verdict on appeal, the Supreme Court must hold that the finding of the jury is against the uncontradicted evidence and every legitimate inference deducible therefrom.

3. INSURANCE—EVIDENCE TO SUPPORT VERDICT.—In an action on certain insurance policies, evidence *held* to support a verdict that insured did not commit suicide.

4. INSURANCE—EVIDENCE—CORONER'S PROCEEDINGS.—Though the minutes of the coroner's inquest were exhibited with proof of death, the policy not requiring such exhibit, evidence of such proceeding was not admissible to prove a defense of suicide in an action to recover on policies.

5. WITNESSES—CORROBORATION BY PROOF OF FORMER TESTIMONY.—The testimony of a witness at a coroner's inquest cannot be read to corroborate his testimony given at the trial.

6. INSURANCE—PENALTY AND ATTORNEY'S FEE.—Notwithstanding the proof shows that a coroner's jury returned a verdict that insured committed suicide, in an action on policies there was no error in allowing the statutory penalty and attorney's fee in judgments for the beneficiaries.

7. INSURANCE—WHAT LAW GOVERNS.—The nature, validity and interpretation of contracts are to be governed by the law of the place where they are made, but the remedies are governed by the law of the forum.

8. COURTS—COMITY.—A construction of a statute of another State will by comity be enforced in the case of a contract there made if not contrary to general public policy of this State and not violative of any statute thereof.

9. APPEAL AND ERROR—HARMLESS ERROR.—In an action on a life policy, where the jury found that insured did not kill himself, an instruction authorizing recovery unless the jury found that deceased intentionally committed suicide was harmless.

Appeal from Miller Circuit Court; *George R. Haynie,* Judge; affirmed.

STATEMENT OF FACTS.

Four separate suits were brought by the beneficiaries against different life insurance companies to recover on policies of life insurance upon the life of Dr. B. E. Dixon and the cases were consolidated for the purpose of trial.

Dr. Dixon had a policy for $5,000 in the Guardian Life Insurance Company of America which was for the benefit of his estate. Dr. Dixon had a policy for $1,000 in the Modern Order of Praetorians, and his minor child, Norman D. Dixon, was the beneficiary. Dr. Dixon had a policy for $3,000 in the Reserve Loan Life Insurance

Company, and the policy named Norman D. Dixon, his minor child, as the beneficiary. Dr. Dixon also had a policy in the Reserve Loan Life Insurance Company payable to his wife, Ura E. Dixon, and the policy had a commuted value of $7,629. Dr. B. E. Dixon died as the result of a pistol-shot wound at the office of A. L. Burford, an attorney, in the State National Bank Building, Texarkana, Ark., a few minutes before noon on the 6th day of December, 1920. It appears from the record that the Buchanan-Vaughan Auto Company, of which Earl Buchanan is president and Carl Vaughan is secretary, had sold Dr. B. E. Dixon an automobile for which he had executed two notes for $1,000 each in part payment and had also turned over to the company his old automobile to be sold and the proceeds applied to the purchase price of the new one. Previous to this transaction, Dr. Dixon had given the Texarkana National Bank a mortgage on his old automobile for $500. The Buchanan-Vaughan Auto Company paid the mortgage of the bank and had the same transferred to it. A. L. Burford was attorney for the company, and had for collection the two $1,000 notes given for the new car and also the $500 note secured by the mortgage on the old car.

According to the testimony of A. L. Burford, at the request of Dr. Dixon he arranged for a meeting between Dr. Dixon and Vaughan and Buchanan at his office for the purpose of trying to adjust their differences. Dr. Dixon was insisting that they should take back his old car, and that he would give them back the new one. Carl Vaughan did most of the talking for the auto company. During the course of the conversation, he pressed Dr. Dixon to know why he had not told them when he let them have the old car that it was mortgaged to the bank. He told Dr. Dixon that the auto company would expect him to pay the $500 that the company had paid to secure a transfer of the mortgage from the bank to it. Mr. Vaughan pressed Dr. Dixon pretty closely about not informing him that the old car was mortgaged, and Dr. Dixon finally asked Mr. Vaughan if he wanted to make

it a personal matter, saying if he did he was ready to do it. Dr. Dixon offered to pay the indebtedness against the old car and take it back, provided they would take back the new car and give him his notes. During the course of the conversation, Vaughan was sitting at the north end of a roll top desk, in the private office of the witness, between it and the corner of a table 8x13 1/2 feet. The table was about two feet longer than the desk and stood in front of the desk about four feet away from it and about six feet from the east wall of the room. Dr. Dixon was sitting two or three feet from the southeast corner of the table, being eight or ten feet from Vaughan. After Dr. Dixon had expressed himself as being ready to settle the matter in a personal way if Vaughan wanted to make it a personal matter, Vaughan made the statement that he was ready to settle it in a personal way if Dr. Dixon wanted to. Burford told them to hush up, that this was not the way to settle the controversy. They then talked further about the matter. Soon afterward Dr. Dixon rose up and drawing a pistol from his overcoat pocket, after taking a step or two toward Vaughan, fired at him. Vaughan rose up and started toward Dixon. The first shot missed Vaughan but the second one struck him. Dixon had an automatic twenty-five caliber, seven-shooting pistol. When Dixon fired the second shot, Vaughan was bent forward facing him. The second shot struck Vaughan at the edge of the hair in the front part of his head. Vaughan fell to the floor on the east side of the table and was rendered unconscious. He was not armed at the time. There were two doors in the private office of Burford. One of them led into a front room which was used by his stenographer, and the other opened into a hall of the building. The door leading into the hall had a spring lock and was usually kept closed. It was opened when the shooting occurred. Burford took hold of Dixon after he had fired the second shot and pushed him toward the hall door. He does not remember whether he pushed him entirely outside or not. Burford then passed into

his stenographer's room and toward his stenographer's desk in order to get to the telephone. In going toward the telephone he had his back to the room in which the shooting occurred. He had not reached the telephone when he heard a third shot, and had not seen anything that had occurred in his private room while his back was to it going toward the telephone. When the third shot was fired, Burford turned around and saw Dr. Dixon about the time he fell to the floor. Dr. Dixon turned or twisted about the time he hit the floor, and almost immediately died. Buchanan ducked down on the floor when Dixon shot at Vaughan. He had gotten up off of the floor when Burford pushed Dr. Dixon towards the hall door. Buchanan did not leave the room until after the third shot was fired. Vaughan raised up after the shooting, but turned sick, and they laid him down on the floor again. There was a large rug on the floor of Burford's private office, and Dixon made no resistance at the time Burford took hold of him and led him towards the door.

According to the testimony of Earl Buchanan, they all rose to their feet when Dr. Dixon first drew his pistol. Dr. Dixon fired the first shot over Buchanan's shoulder and missed Vaughan. The second shot hit Vaughan, and he fell down on the floor. Burford then went to Dr. Dixon, put his arm around his shoulder and pushed him out of the room. Buchanan had ducked down on the floor when Dixon fired the second shot, and he got up just after Dr. Dixon went out of the room. After Dixon had been pushed from the room he walked back into it. He looked around at Mr. Vaughan on the floor and then placing the pistol to his head, pulled the trigger and shot himself. He just simply raised the gun to his head and fired. He immediately fell on his face on the floor. Burford and Dixon had no scuffle, and Dixon was led out of the room easily and gently. There was no more noise about it than the ordinary walking of two men. Buchanan knew the pistol had steel-jacketed bullets because an automatic pistol does not shoot anything else.

Other occupants of the building heard the shots and ran to Burford's office. They found Dr. Dixon lying on his back with his head pretty close to the door entering the stenographer's office and with his feet turned toward the east door of Burford's office leading into the hall. His head lay a foot or two from the door leading into the stenographer's office. The wound was in his hair on the right side of his head behind the ear. There was blood and apparently brains coming from it. The witnesses did not notice any pistol until after Dr. Lightfoot came in. Dr. Dixon had on his overcoat and the flap of it was lying over his right arm and hid it from view. When Dr. Lightfoot took hold of Dixon's right hand, the pistol fell from it. Vaughan was still down on the floor when the witnesses ran in after the shooting.

G. G. Pope, an attorney, had offices in the same building directly under those of A. L. Burford. He was a witness for the plaintiffs. According to his testimony he heard two quick shots; then a sort of scuffling around like they were moving furniture or something, and then he heard another shot. On cross-examination Pope stated that the impression he got was that some kind of furniture was moved; probably chairs or something like that.

According to other witnesses there were four bruises on the head and face of Dr. Dixon. There was a bruise below the eye and one above it. There was also a small bruise at the edge of the hair. The fourth bruise was above and a little to the left of the front bruise on the edge of his hair. The spots were dark, but there was not any swelling except a little puff under his eye. Experiments were made with the pistol found in the hand of Dr. Dixon by shooting it at a white cloth. One shot was fired at a distance of about four inches from the cloth, the next shot was six inches, the next eight, and the next twelve. The cloth was white and clean before the shots were fired. The first shot showed powder burns on the cloth and the other marks just powder. Similar experiments were made by firing the same pistol at a dressed

chicken at close range and powder burns were also found on the body of the chicken.

The pistol wound was over the right ear of Dr. Dixon, a little behind and above it. The wound was a clean one. There was no blistering of the skin, and there were no powder burns. The flesh or skin was not scorched or burned, and the hair was not singed. The above is the testimony of the undertaker who had charge of the body of Dr. Dixon. He testified that in twenty years' experience he had seen two or three bodies a year where death had resulted from a pistol wound, self-inflicted, and that the bodies showed powder burns; that in some instances the flesh was bleached or scorched, but there was always powder burns.

Other witnesses for the plaintiffs testified that Earl Buchanan testified at the coroner's inquest that he was down on the floor looking at Mr. Vaughan when the third shot was fired and did not see Dr. Dixon until he fell on the floor. Earl Buchanan denied that he had so testified.

Other testimony will be stated or referred to in the opinion.

The jury returned a verdict for the plaintiffs in each case, and from the judgments rendered in favor of the plaintiff the defendants have duly prosecuted an appeal to this court.

*Frank G. West, Thomas L. McCullough, King, Mehaffy & Wheeler,* for appellants; *Guilford A. Deitch,* of counsel.

1. The coroner's inquisition was admissible in support of the proposition that Dr. Dixon committed suicide, and the court erred in excluding it.

The certified copy of the inquest proceedings was admissible in evidence, to be considered by the jury as a part of the proof of death, and as admissions on the part of the claimants, the plaintiffs. 22 Corpus Juris 296; *Id.* 321; *Id.* 327; 4 Cooley's Briefs on Law of Insurance, pp. 3467, 3468, 3471, and authorities cited.

2. It was error to permit the coroner and certain members of the coroner's jury to testify that Earl Buchanan, when a witness in the inquisition proceedings, made certain statements at variance with and contradictory of the written testimony certified to and returned with the inquest proceedings. Neither the coroner nor any member of the jury can be permitted to contradict such written and certified testimony. C. & M. Digest, § 1582; 59 Ark. 50; 26 S. W. 377.

3. The coroner's inquisition, the official return with the verdict of the jury and the coroner, signed by all of them, etc., was competent impeachment of the testimony of the coroner. C. & M. Digest, § 4187.

4. The allowance of the penalty and attorney fees against the Guardian Life Insurance Company and the Reserve Loan Life Insurance Company was clearly erroneous. It was shown that the defendants refused to pay the policies in full upon the sole ground that the disclosures in the proof of death, including the copy of the proceedings before the coroner, showed that Dr. Dixon had committed suicide, and that the extent of their liability was the amount due under the suicide clause in the policies. We think the principles of the law of estoppel applies here. 9 Ark. 141.

5. As to the Reserve Loan Life Insurance Company, the penalty and attorney fees were not recoverable because its contracts were made and delivered to the insured in Texas, and the Arkansas statute will not apply. 164 S. W. 296; 247 Fed. 677; 78 So. 22; 191 S. W. 418; 199 S. W. 108.

6. It was clearly erroneous to give this instruction: "The jury are instructed that suicide within the meaning of the policy sued on is intentional self-destruction, * * * and unless the jury find * * * * that deceased intentionally killed himself, your verdict will be for the plaintiff." So worded, the instruction limits the question of suicide to one of intention, whereas the policies of the Reserve Loan Life Insurance Company except the risk of self-

destruction, whether the insured is sane or insane. Self-destruction by an insane person is not suicide. Black's Law Dictionary. The policies do not limit the act to intentional suicide. 118 Fed. 374; 258 Fed. 897; 41 S. W. 461; 27 S. E. 39; 81 N. E. 19; 24 Atl. 656; 39 N. W. 658; 88 N. W. 687.

7. It was error to charge the jury that, "unless this presumption against suicide has in this case been over-thrown by evidence, your verdict will be for the plaintiff." The fact that there is a presumption of law against sui-cide does not alter or control the proved facts. Such presumption is available only in the absence of evidence. Where proof of the facts is made, the question is to be determined from the greater weight of the facts so proved, and not from any presumption of law. 213 S. W. 45, and authorities cited.

*Jones & Head,* for appellees.

1. It is settled in this State, both as to ordinary in-surance companies, and as to fraternal societies, that proceedings at a coroner's inquest, even though returned by a beneficiary in the proof of loss, are not admissible in evidence in an action to recover on the policy; and this rule obtains in other jurisdictions as well. 7 Cooley's Brief, § 3134 (b); *Id.* § 7435 (f); 126 Ark. 483; 106 *Id.* 91-101; 144 *Id.* 126; 144 U. S. 76-88; 80 N. E. 429.

2. The position taken by the appellants in effect that the testimony as shown by the minutes of the cor-oner's inquest, are inviolate, and that they are absolutely binding on all parties, is not supported by *Cole* v. *State,* 59 Ark. 50, relied on by them, nor by the decisions of this and other States. See 22 C. J. 428; 60 Ark. 400; 71 *Id.* 351; 76 *Id.* 515; 112 *Id.* 37; 134 *Id.* 340; 98 S. W. (Ky.) 296.

3. As to the impeachment of Earl Buchanan: It has been held that, even though the witness is present who took the testimony at a former trial, and even though such witness swears that the testimony is correct, such

testimony may, nevertheless, be impeached by the testimony of others present at such trial. 76 Ark. 515; 33 *Id.* 539; 68 *Id.* 441.

4. Appellants' good faith in denying liability, because of the proofs of death being accompanied by the coroner's jury verdict showing suicide, affords no defense against the allowance of damages and attorney's fees under the statute. 86 Ark. 115; 106 *Id.* 91.

The fact that contracts with the Reserve Loan Life Insurance Company were made in Texas will not defeat the imposition of the damages and attorney's fees. 119 Ark. 102; 131 *Id.* 419; 7 Cooley's Brief, § 3885 (a); *Id.* § 3886 (a); 178 S. W. 816; 176 S. W. 266. If it is a Texas contract, the courts of this State will apply to the construction given by the courts of that State, and the result is the same; 61 S. W. 336; 86 Ark. 121; 58 S. E. 93; 109 S. W. 1116.

The enforcement of penalty and attorney's fees is a matter connected with the performance of the contract, and is governed by the law prevailing at the place of performance—Miller County, Arkansas, in this case. 91 U. S. 406; 23 L. Ed. 245; 68 S. W. 889; 222 S.W. 832.

5. No error in the court's instruction 1. Dr. Dixon's sanity or insanity was not in issue. The instruction meant to differentiate between an intentional act and an accidental or unintentional one. Moreover, the appellants cannot complain now. The giving of this instruction was not made a ground for new trial. 144 Ark. 126; 258 Fed. 897; 147 U. S. 888; 213 S. W. 45.

6. In this State, the presumption against suicide is not one of law; but one of evidence. 128 Ark. 155; 144 *Id.* 126; 131 *Id.* 419; 136 *Id.* 84-93. See also Cooley's Briefs, § 3255 and authorities cited.

HART, J. (after stating the facts). Each of the policies of insurance sued on contained a clause rendering the policy void in the event of the self-destruction of the insured.

The defendants assign as error that the evidence fails to sustain the finding of the jury that the insured did not commit suicide. Before entering into a discussion of the evidence on this question, it is well to state the principles of law which should govern the jury in reaching its verdict, and which must govern us in testing the legal sufficiency of the evidence to support the verdict.

In the first place, there is a presumption against suicide, and such presumption stands until overthrown by evidence in favor of the insurer. *Grand Lodge of A. O. U. W.* v. *Banister,* 80 Ark. 190; *Aetna Life Ins. Co.* v. *Taylor,* 128 Ark. 155; *Columbian Woodmen* v. *Matlock,* 144 Ark. 126; and *Watkins* v. *Reliance Life Ins. Co., ante* p. 12.

Under the settled rules of practice in this State, to disturb a verdict on appeal, we must hold that the finding of the jury is against the uncontradicted evidence and every legitimate inference deducible therefrom. The reason for the rule is, first, that the jury have weighed the evidence and found the verdict; second, that the trial judge who also heard the testimony from the mouths of witnesses and weighed the same, has, by overruling the motion for a new trial, given the approval of his legal judgment to the verdict; and third, this court can not have the benefit of seeing and hearing the witnesses and observing them while testifying, but only reads the substance of their testimony as it appears from the record. *St. L. S. W. Ry. Co.* v. *Ellenwood,* 123 Ark. 428. In this case, not only the jury found against suicide, but the verdict has the approval of the trial court. As we have already seen, there is a presumption against suicide, and the burden of establishing self-destruction by a preponderance of the evidence is upon the insurer. The question presented for our determination is whether or not the evidence for the insurance companies has overcome this presumption as a matter of law. We cannot say that the verdict of the jury was the result of conjecture mere-

ly. It is true that, according to the testimony of Earl Buchanan and A. L. Burford, Dr. Dixon committed suicide; but it can not be said that their testimony is undisputed, and therefore conclusively establishes the fact of suicide. There was direct proof that there were no powder burns observed on Dr. Dixon's head near the wound. This condition is met by the defendant's declaration that their proof shows that the cartridges used were loaded with smokeless powder, and that this kind of powder would not cause powder burns.

Again, they say that the blood flowing from the wound caused the powder burns to be effaced. The trouble about this position is that the jury did not accept this explanation, but believed the witnesses for the plaintiffs on this point. An undertaker of twenty years' experience said that, in cases where the shot was fired by the person killed, there were always powder burns and sometimes scorched or blistered places. Other witnesses testified that they fired bullets from the pistol found in the hands of Dr. Dixon at the body of a dressed chicken; and that, when fired at close range, the body of the chicken showed powder burns. Again, other witnesses fired the pistol at a clean white cloth at a close range, and the cloth showed powder burns.

Then, too, a lawyer who had an office directly under the office of Mr. Burford testified that after the first two shots were fired, he heard a noise as if furniture of some kind was being moved about in the room before he heard the third shot.

The jury might have inferred from this that there was a scuffle of some kind going on in the room after the first two shots were fired and before the third one was fired. It is true that Buchanan and Burford testified that such was not the case. But we must deal with legal inferences that the jury might draw from the evidence as a whole.

Then, too, the jury might consider the fact that there was no motive for suicide on the part of Dr. Dixon, ex-

cept the fact of his quarrel with Vaughan and Buchanan, and his shooting Vaughan in hot blood.

Again, the jury might consider the fact that four bruises were found upon the face and head of Dr. Dixon. It is true, as suggested, that these might have been produced by his fall, but this is not conclusive.

While Buchanan testified at the trial that he saw Dixon shoot himself, he also testified that he was very much excited at the time. Witnesses for the plaintiffs testified that at the coroner's inquest Buchanan testified that he was down on the floor when the third shot was fired and did not see Dr. Dixon until he fell. Under these circumstances it cannot be said as a matter of law that the testimony of Buchanan and Burford is so consistent with itself that it overcomes the circumstances tending to contradict it.

We cannot say, as a conclusion of law, that the evidence is not legally sufficient to support the verdict, when viewed in the light of all the surrounding circumstances and the presumption against self-destruction. Where reasonable men may differ as to the legal sufficiency of the evidence, the jury, and not this court upon appeal, must determine the issue.

It is also assigned as error that the court excluded from the jury the proceedings of the coroner's inquest which contained the finding that Dr. Dixon came to his death by a gunshot wound self-inflicted. This court has held that where, in an action against a life insurance company to recover for the death of the insured, the defense is that he committed suicide, the duly certified verdict of a coroner's jury is not admissible for the purpose of proving such defense. *American Natl. Ins. Co.* v. *White,* 126 Ark. 483.

It is also insisted that, inasmuch as the minutes of the coroner's inquest were exhibited with the proof of death, the same should be admitted on the trial of the issue in the present case as in the nature of an admission by the beneficiaries that the insured committed

suicide. There is nothing in the policy which requires the proceedings at the coroner's inquest, including the verdict of the jury, to be exhibited with the proof of death, and under the holding in the case last cited, such evidence is not admissible in an action by the beneficiary to recover on the policy.

We are in effect asked by counsel to overrule that case, but we decline to do so. The case of *Aetna Life Ins. Co.* v. *Milward,* 118 Ky. 716, is cited in support of it. That case is also reported and annotated in 68 L. R. A. 285.

After a thorough discussion of the question the annotator says that a consideration of the whole matter leads to the conclusion that the weight of authority in the United States is against the reception of the verdict of the coroner's jury. This case is also reported in 4 Ann. Cas. 1092, and in a note to the case it is said that the holding of the main case is in accord with the weight of authority.

The case from our court of *Cole* v. *State,* 59 Ark. 50, lends no support to the contention of counsel for the defendants. That was a criminal proceeding in which Cole was present at the coroner's inquest and was suspected of being guilty of the homicide. Subsequently he was indicted for the murder of the deceased, and on his trial the court held that it was competent for the State to show what he had testified to at the coroner's inquest because he was a party to it.

The proof of the death of Dr. Dixon was in all respects complete without the minutes of the coroner's inquest. Its contents form no part of the representations of the claimants; the statements therein contained were not sworn to by them, nor presented as worthy of belief. No issue was raised by the insurance company as to the fact of Dr. Dixon's death, and the claimants were in no respect bound by the minutes of the coroner's inquest.

It is also insisted that the minutes of the coroner's inquest were admissible to show what Earl Buchanan testified to in that proceeding. We do not agree with counsel in this contention. Earl Buchanan was a witness

for the insurance companies on the trial of this cause, and related the circumstances surrounding the killing as he saw them. His testimony at the coroner's inquest could not be read to corroborate his testimony given at the trial. It is true that certain witnesses at the trial testified that Earl Buchanan stated at the coroner's inquest that he was down on the floor and did not see Dr. Dixon at the time the third shot was fired, and only saw him as he was falling to the floor after it was fired. It will be remembered that Buchanan testified on the trial of this case that he saw Dr. Dixon point the pistol at his own head and fire it. It was competent for the plaintiffs to introduce the testimony in question for the purpose of contradicting the testimony given by Earl Buchanan at the trial of this case. Earl Buchanan denied having testified before the coroner's jury that he did not see Dr. Dixon point the pistol at his own head and fire it. It was not competent to corroborate his testimony in this respect by what he testified to at the coroner's inquest. This would have the effect, not only of bolstering his own testimony, but all parties concerned in this trial would be bound by what he testified to in that proceeding. It was a proceeding in which none of the parties in the present case were directly interested.

It is next insisted that the court erred in fixing the statutory penalty and attorney's fee against the insurance companies. We do not agree with counsel in this contention. In *Arkansas Ins. Co. v. McManus*, 86 Ark. 115, the court held constitutional our statute providing that in all cases where loss occurs and the insurance company liable therefor shall fail to pay the same after due demand made therefor, such company shall be liable to pay to the holder of such policy in addition to the amount of the loss, twelve per cent. damages, together with all reasonable attorney fees. The court sustained the statute as a penalty which the Legislature might impose under the police power by which it regulates insurance companies. See also *Mutual Life Ins. Co. v. Owen*, 111 Ark. 554.

It is claimed, however, by the defendants that, inasmuch as the proof of death showed that the coroner's jury had returned a verdict that Dr. Dixon came to his death by a wound self-inflicted, the penalty and attorney fees prescribed by the statute should not be imposed. This contention has been decided adversely to the defendants in the case of *Fidelity and Casualty Co.* v. *Meyer,* 106 Ark. 91. No valid reason is assigned by the defendants why the rule laid down in that case should be changed, and we adhere to it.

It is also insisted by the defendants that some of the policies were executed and delivered to the insured in the State of Texas, and for that reason our statute providing for penalties and attorney's fees should not apply. This court has held that the nature, validity and interpretation of contracts are to be governed by the law of the place where they are made, but the remedies are governed by the law of the forum. *Lawler* v. *Lawler,* 107 Ark. 70, and *Wilson* v. *Todhunter,* 137 Ark. 80.

The statute of the State of Texas provides that in all cases where the loss occurs and the life insurance company liable therefor shall fail to pay the same within the time specified in the policy after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve per cent. damages on the amount of such loss, together with all reasonable attorney fees for the prosecution and collection of such loss. Texas, Rev. Stat. 1895, § 3071.

This section was construed by the Court of Civil Appeals of Texas in *Mutual Reserve Life Ins. Co.* v. *Jay,* 109 S. W. 116. The court said that the additional twelve per cent. upon the amount of the policy provided for in the statute is not a penalty, but is declared to be damages, and that every contract of insurance of the nature provided for entered into in the State of Texas is made in view of the statute, and its provisions enter into and form a part of it. A writ of error was denied by the Supreme Court of the State of Texas. Hence it may be taken as

settled by the Supreme Court of that State that the plaintiffs were entitled to the twelve per cent. as damages together with a reasonable attorney's fee. That construction of the statute will be enforced by comity in this State because it is not contrary to our general public policy on the question and is not violative of any statute of this State.

It is also insisted that the judgment must be reversed because the court in its instructions gave the plaintiff the right to recover unless the jury should find from a preponderance of the evidence that the deceased intentionally killed himself.

Counsel for the defendants contend that in the policies of some of the companies the intention of the insured is not material, but that the policies are void if he kills himself intentionally or accidentally. No prejudice could have resulted to them from this instruction, because the jury made a special finding that Dr. Dixon did not shoot himself.

Other assignments of error are made, which we have considered and find not well taken. We do not deem them of sufficient importance to merit a detailed discussion.

We have carefully examined the record and have found no reversible error in it.

It follows that the judgment will be affirmed.