Industrial Mutual Indemnity Company *v.* Watt.

Opinion delivered June 27, 1910.

1. Death—presumption against suicide.—The presumption against suicide goes so far as to justify the inference, upon proof of a self-inflicted death, that the killing was accidental. (Page 458.)

2. Insurance—suicide as defense—when question for court.—In an action upon a policy of life insurance where the defense was that the insured committed suicide, which was an excepted risk, it was error to submit the question to the jury whether the killing was accidental if the undisputed evidence establishes that the killing was intentionally self-inflicted. (Page 459.)

Appeal from Garland Circuit Court; *W. H. Evans,* Judge; reversed.

STATEMENT BY THE COURT.

The Industrial Mutual Indemnity Company issued to William N. Watt a policy of life insurance for the sum of $1,000, payable to Mabel Watt, his wife. William N. Watt died from a pistol shot wound, and Mabel Watt brought this suit to recover the amount of the policy.

The policy contained a clause which exempts the insurance company from liability in the event of the death of the policy holder from self-destruction, and this was the only defense interposed.

William N. Watt died on the 28th day of December, 1906, in the city of Hot Springs, Arkansas, from a pistol shot wound. The facts bearing on the question of suicide are as follows:

William N. Watt was a married man, about 45 years old, and resided in the city of Hot Springs, Arkansas, where he held the office of constable. He had a wife, but no children.

On the evening of the 27th of December, 1906, Watt and his wife went to a dance, returning home some time after 12 o'clock at night. They slept in the same bed that night, and along about 3 or 4 o'clock in the morning Watt asked his wife if she would not die with him, and she told him that she did not think it was the right thing. The next morning about 9:30 o'clock, Mrs. Watt, who had arisen from bed and dressed herself, heard a pistol click. She at once turned and looked at her husband, who was still in bed. He had a pistol in his hand. Neither said a word for a minute, but just looked at each other. Watt then said to his wife that he was going to put the pistol over under the other pillow. He was in the habit of carrying a pistol and sleeping with it under his pillow. Shortly afterwards he arose, and went down town. About 12:30 o'clock of that day, he left his office for his home. At the time, he told one of his deputies that he would be back that afternoon. Before going home, however, he called up a friend and inquired why she and her husband had not gone to the dance the night before, and appeared to be in his usual spirits. When he reached his home, he sat down in his wife's lap, and asked her to untie his collar and cravat. He told her of the death of a friend of his. He then undressed, and told her that he would lie down and take a nap before dinner. He lay down on his back on the bed, putting his pistol under his pillow. His wife left the room, and in a few minutes, probably five, she heard a pistol shot in the room where her husband was, and she went to his door and looked in, but did not enter. She gave the alarm, and Disheroon, a neighbor, came in. He went into the room, and found Watt lying dead on the bed on his back with a pistol shot wound in his breast. His undershirt was on fire where the ball entered, and Disheroon put out the flame. He and other witnesses who came in stated that Watt was lying on his back stretched out on the bed. He was shot through the heart. The bullet passed through his body and on down through the mattress on to the floor. Neither the bed clothes nor anything else in the room was disarranged. A 45-caliber six-shooter was lying on the bed, and one chamber appeared to have been recently discharged, and the wound was made by a pistol of that caliber. Mrs. Watt stated in the proof of loss made by her that her husband died as the result of a pistol shot wound inflicted by himself.

She repeated this statement at the trial, but says that she did not know whether it was accidental or not. About one year before this Watt had attempted to kill himself by taking morphine. His wife stated that he appeared to be in as good spirits as usual when he came home on the day in question, but stated that he spoke of the death of his friend, which occurred in the city of Hot Springs where he resided.

The trial resulted in a verdict for the plaintiff for the amount of the policy, and from the judgment rendered the defendant has duly prosecuted an appeal to this court.

*James E. Hogue* and *Calvin T. Cotham*, for appellant.

From the evidence given on the trial but one reasonable inference could be drawn, and that was that the deceased took his own life. 100 Wis. 266; 75 N. W. 991. Isolated facts should not be singled out in instructions. 75 Ark. 76. And they should be hypothetical. 14 Ark. 287; *Id.* 531; 31 Ark. 699.

*Wood & Henderson* and *C. V. Teague,* for appellee.

If a party does not follow the ruling of the court on his objections by clinching it with an exception, he waives the objection. 73 Ark. 409; 44 Ark. 106. Even the verdict of a coroner's jury finding that his death was suicidal would not have made a *prima facie* case to that effect. 80 Ark. 190. The burden of proving suicide was on the defendant. 80 Ark. 194; 73 Am. St. R. 244.

HART, J., (after stating the facts). It is insisted by counsel for appellant that the evidence did not warrant the verdict of the jury.

In discussing the principle of law applicable to cases of this sort, in *Grand Lodge of A. O. U. W.* v. *Banister,* 80 Ark. 190, the court said: "In the first place, there is a presumption against suicide or death by any other unlawful act, and this presumption arises even where it is shown by proof that death was self-inflicted—it is presumed to have been accidental until the contrary is made to appear. This rule is founded upon the natural human instinct or inclination of self-preservation, which renders self-destruction an improbability with a rational being." To the same effect, see *Clemens* v. *Royal Neighbors of America,* 8 Am. & Eng. Ann. Cases, 1111, and case note; *Lindahl* v. *Supreme Court Independent Order of Foresters,* 8 L. R. A. (N. S.)

916; *Tackman* v. *Brotherhood of American Yeomen,* 8 L. R. A. (N. S.) 974.

Hence we see that if reasonable men, viewing the facts, which are undisputed, might come to different conclusions as to whether the deceased committed suicide, then the facts, although undisputed, were properly submitted to the jury.

A careful consideration of the facts and circumstances adduced in evidence irresistibly lead us to the conclusion that the death of Watt was by suicide. All the physical facts point that way, and they are inconsistent with any other reasonable theory. It is conceded that all the circumstances point with certainty to the conclusion that Watt shot himself; but counsel for appellee claim that the jury might have found that it was accidental, and rely on the Banister case cited *supra* as sustaining their contention that the court properly left it to the jury to decide whether his death resulted from accident or suicide.

We are of the opinion that the facts in the case at bar tending to establish suicide are much stronger than in the Banister case. There it was shown that Banister was very nervous and excitable, always being in fear of burglars when aroused from sleep. The killing occurred at night after he had retired and from the physical facts it was not impossible that he might have inflicted the wound by accident in restlessly tossing in slumber or upon awakening suddenly and in affright. He was shot in the temple. He had never talked of killing himself. Here the facts are essentially different. Watt had about one year previous to his death attempted to kill himself. On the very day of the unfortunate occurrence, he had at 3 or 4 o'clock in the morning, a time when people usually sleep soundest, talked with his wife about the self-destruction of both her and himself. After she had risen next morning, and before he had left his bed, she heard the click of his pistol. The fact that they looked at each steadily for a minute and said nothing, as she says they did do, indicates that his later remark that he was changing his pistol from one pillow to another was a subterfuge. If that was his purpose, there was no occasion for the pistol to click, and no occasion for them to look each other steadily in the eye without saying anything. He shortly afterwards arose and went down town, carrying the pistol with him. While she says he was cheerful when he returned at noon, he

was still talking of death. He referred to the death of his friend. Then the immediate facts attending his death of themselves shut out the theory of accidental shooting. He was found lying on his back stretched out on the bed, and there appeared no disarrangement of the bed clothes. His undershirt was on fire where the bullet entered his body in the region of his heart. It went through his body on down through the mattress and on to the floor, and its course could be traced from the position in which he lay. The condition of the body when it was found and the course of the bullet, coupled with his recent statements and acts in regard to self-destruction, are conditions and circumstances inconsistent with any other reasonable cause of death than that of suicide.

The judgment will therefore be reversed, and the cause dismissed.