ÆTNA LIFE INSURANCE COMPANY v. ALSOBROOK.

Opinion delivered November 21, 1927.

INSURANCE—EVIDENCE OF SUICIDE.—In an action on a life insurance policy, evidence showing that the barrel of a shotgun must have been held in the insured's mouth at the time it was fired, the location of insured when found, the fact that no other person had been near, and that he had just been arrested, charged with a felony, *held* to establish a suicide, rendering the court's refusal to instruct a verdict for insurer error.

Appeal from Ouachita Circuit Court, Second Division; *W. A. Speer*, Judge; reversed.

*Geo. W. Hays* and *Owens & Ehrman,* for appellant.
*Fred Morton, T. J. Gaughan, J. T. Sifford, J. E. Gaughan* and *Elbert Godwin,* for appellee.

McHANEY, J. On March 18, 1925, the appellant issued and delivered to B. B. Alsobrook, son of appellee, a policy of life insurance, insuring the life of said B. B. Alsobrook in the sum of $2,000, in which appellee was named as beneficiary, which policy contained the following provision: "If the insured shall commit suicide within one year from the date hereof, while sane or insane, the company will be liable only for an amount equal to the premiums paid in cash thereunder."

On March 17, 1926, less than one year from the date of said policy, said B. B. Alsobrook, having theretofore been a mail carrier, was arrested by a United States Marshal on a warrant charging him with embezzlement of United States mail. This was about 6:30 in the morning. The marshal informed Alsobrook that he would

take him to Pine Bluff on this warrant, and Alsobrook asked permission of the marshal to get a car to go in, stating that he could do so in a few minutes, which permission was granted by the marshal. He left the marshal, and went immediately to the room of his friend, Dale Garrett, and borrowed his car, stating that he was going to Pine Bluff, and appeared to be in quite a hurry. A short time later he drove the car to the home of his friend, J. W. Crosley, and there borrowed a double-barrel breech-loading sixteen gauge shotgun, stating that he wanted the gun to go hunting, and was in quite a hurry, promising to bring the gun back that evening. Crosley cautioned him about the gun, as it was loaded. Alsobrook was perfectly familiar with the gun, as he had often borrowed it before. The gun was placed in the rear end of the Ford touring car. Alsobrook was not seen thereafter until about 7:30 that morning, when he was found on a by-road, which was not frequently traveled, not being a regularly traveled road, lying beside the car, across the stock of the gun, with his head to the rear of the car, dead. His face was bloody, and a Mr. Lea, who discovered him, although well acquainted with him, did not at first recognize him. He made an examination, and found that Alsobrook was shot in the mouth, the shot ranging from the roof of the mouth toward the back of the head, without any visible wounds or powder-burns on the outside of his mouth or his face anywhere; that the skull was torn to pieces by the shot, the back of his head being soft and mushy, but the skin on the outside of his head was not broken, none of the shot passing through the head to the outside; that one of his front teeth was missing. On an examination of the gun it was found to be the same gun he had borrowed from Mr. Crosley, the right-hand barrel of which had been fired, and the hammer on the other barrel cocked, and that the barrel of the gun was about 28 inches in length. It could not be told whether the roof of the mouth showed powder-burns, on account of the excessive amount of blood. The front door of the car was open, and there were no tracks around

the car except his own, and no sign to show that any one else had been there, that there had been a struggle with a contending enemy, nor were there any powder-burns on his clothing. The territory he was found in was not good for squirrel hunting, and it was the closed season on quail. It was shown that Alsobrook was a man of a happy disposition, and the witnesses who saw him on this fateful morning agree that he showed no signs of worry or trouble. Expert evidence was introduced to show that powder from a sixteen-gauge shotgun will burn anywhere from six to eight feet from the muzzle of the gun, and that the shot begin to scatter immediately after leaving the barrel; that the closer the barrel of the gun is to the object, the more the powder would burn, and the narrower the spread of the load. The expert answered a hypothetical question that, assuming that the entire load of the shot entered the roof of the mouth with no powder burn, wound or mark on the face, and the whole top of the head was soft, and stated that in his opinion the gun was in the deceased's mouth at the time of its discharge.

At the conclusion of the evidence appellant requested the court to instruct the jury to find for the appellee in the amount of premiums paid by the insured, $96.12, and costs to the time of filing the answer, offering to confess judgment for that amount, and for the appellant for the costs incurred subsequent thereto, which the court refused to give, and submitted the case to the jury on appellee's theory of an accidental death, which returned a verdict against appellant for $2,000, and it has appealed.

We think the court erred in refusing to give appellant's requested instruction No. 1. Under the clause of the policy already quoted, the company's liability was limited to the amount of premiums paid by the insured in case of suicide within one year from the date of the policy. We think the undisputed evidence, in fact all the evidence, clearly establishes the fact that the insured committed suicide, and that it overcame the presumption of law against suicide and the presumption that he was

killed accidentally, rather than by suicide. As was said by this court in the case of *Grand Lodge of A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742, cited with approval in *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569-570, 243 S. W. 831: "In the first place, there is a presumption against suicide or death by any other unlawful act, and this presumption arises even where it is shown by proof that death was self-inflicted; it is presumed to have been accidental until the contrary is made to appear. This rule is founded upon the natural human instinct or inclination of self-preservation, which renders self-destruction an improbability with a rational being." Here we think the contrary does appear, and that it is undisputably shown that death was intentionally self-inflicted. And, as was said in the case of Watters, *supra,* "after a careful consideration of the facts and circumstances in the instant case, we are unable to account for the death of the insured upon any other reasonable hypothesis than suicide." And, as was again said in the same case, "reasoning upon the undisputed physical facts in the case, we are unable to evolve any reasonable theory by which the insured could have been accidentally shot."

It was shown conclusively, we think, that, unless the barrel of the gun had been in Alsobrook's mouth at the time it was fired, he could not have received the wound he did receive without also receiving a wound on the outside of the face, and, if the gun were close enough, would have been burned by the powder. We think the muzzle of the gun must, of necessity, have been in the insured's mouth at the time it was fired. And, taking into consideration his location, the fact that no other person had been about there, the fact that he had just been arrested, charged with a felony, and all the other facts and circumstances heretofore set out, we think the conclusion is irresistible, and much stronger even than the Watters case, that he committed suicide.

The judgment will therefore be reversed, and judgment will be rendered here against appellant for $96.12.