HOME LIFE INSURANCE COMPANY *v*. MILLER.

Opinion delivered December 15, 1930.

902

904.

*Searcy & Searcy* and *Wynne & Miller,* for appellant.

*King & Whatley, J. H. Landes* and *McKay & Smith,* for appellee.

KIRBY, J., (after stating the facts). Appellant insists that the court erred in refusing to give its peremptory instruction directing a verdict in its favor and the contention must be sustained.

The rule has often been stated that this court will not interfere with a verdict supported by any substantial evidence, and that in arriving at that conclusion the strongest probative force will be given to the testimony and the reasonable inferences deducible therefrom favoring the party for whom the verdict is rendered. If the facts are such that men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute, then the issues are properly sub-

mitted to the jury for determination, and in such cases the court should not substitute its judgment for that of the jury. *Harris* v. *Bush,* 129 Ark. 369, 196 S. W. 471; *Guardian Life Ins. Co.* v. *Dixon,* 152 Ark. 597, 240 S. W. 25; *Grand Lodge A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742; *Mutual Life Ins. Co. of N. Y.* v. *Raymond,* 176 Ark. 883, 4 S. W. (2d) 536.

An eminent annotator in discussing the right of an insurer to a directed verdict upon the issue of suicide makes the following statement of the law relative to the rule governing trial courts in suits upon insurance policies when the defense of suicide is relied upon, to-wit:

"Although in all jurisdictions the courts apparently recognize the existence of a strong presumption against suicide, the presumption is rebuttable, and it is held that an insurer setting up suicide of the insured as a defense to a recovery on a policy may be entitled to a directed verdict in its favor on the issue of suicide, if the evidence produced is so clear and conclusive as to overcome the presumption and leave no reasonable basis for a jury to arrive at any other conclusion than that of suicide. Under such conditions the issue of fact is no longer one for the jury to speculate on and should be decided by the court by means of a peremptory instruction to render a verdict for the insurer.

"So where all the evidence produced on the trial overcomes the presumption, convincingly indicates suicide, and is inconsistent with accident or murder, the insurer is entitled to a directed verdict on the defense of suicide." 37 A. L. R. 171.

This rule appears to have been adopted and followed by the majority of courts, both State and Federal, and our own court has announced the rule and its adherence thereto in *Industrial Mutual Indemnity Co.* v. *Watt,* 95 Ark. 456, 130 S. W. 532, and in *Mott* v. *Sovereign Camp,* 155 Ark. 259, 244 S. W. 733.

The insured either killed himself purposely or by accident, or was killed by some one else. The undisputed testimony shows he was continually worried and har-

assed about existing conditions in his office, that he was depressed at all times, not to say gloomy, that he was listless and indifferent about the conduct of his office, knew that he was short in his accounts, was unable to make settlement with the State for the revenues collected, and that his shortage would be immediately discovered. Upon returning from the last visit to his fiance at Shreveport, he wrote the letters expressing a fixed determination to kill himself, saying that he was then looking into the face of death, which he regarded as most horrible, expressed the belief that he would be forgiven for killing himself, and wrote resignedly as though his determination was fixed and irrevocable. The undisputed testimony shows that he was in possession of the pistol, which had belonged to his former wife, with which he was killed, and still clutched it in his right hand when his body was discovered after he had been shot therewith. It was impossible for him to have killed himself accidentally, the second shot fired, the fatal one, occurring about five minutes after the firing of the first, the bullet from which did not penetrate the skull. Evidently the shots were fired after he had lain down on the bed with the pistol pressed against his forehead. The physicians stated that he would not have been able to get into the bed and assume the position he was found lying in had he been standing up during the firing of either of the shots. One of them stated that the first shot might not have rendered him unconscious, and, although the others testified that it would, they said it would only have been temporarily so. There was time enough between the firing of the shots for him to have recovered from the shock of the first sufficiently to press the pistol against his head and fire the second shot in accordance with his fixed determination to kill himself. There was no evidence whatever of the presence in the room of any one else when the shots were fired or indicating that they might have been fired by some one else on the outside of the building. There was no evidence whatever indicating the presence of any one in the

vicinity who would have attempted to kill the insured, and it is unbelievable, in view of human experience, that one who sought to murder the insured would fire the first shot into his head and wait five minutes before firing the last. Although the testimony showed that the sheriff had been active in enforcing the prohibition law and had received one threatening letter from a particular township in his county if he should come down there for that purpose, there was no particular threat shown to have been made by any one who desired his death or might have attempted to kill him.

It is true this woman, who received the letters, written the last night of his life, expressing his undying affection for her and a fixed determination to kill himself, did not testify, but the proof was conclusive that the insured wrote the letters, and they were of no less probative value, having been shown to have been written by him, than if this woman "he loved," who delivered them to the insurance company, had appeared personally in court and testified to the circumstances under which she received them.

The physical facts, as already said, are not consistent with the theory of an accidental killing which could be conceived of and cannot be reconciled with any manner of killing other than suicide. There is no suggestion in the record of any facts from which a reasonable inference might be taken that the insured met his death at the hand of another through foul play. The presumption of accidental killing was overcome by the undisputed facts and circumstances, and the court should have directed a verdict for appellant in accordance with its request.

The judgment is accordingly reversed for failure to do so, and judgment will be rendered here for the $1,000, one-tenth of the face of the policy, in accordance with the terms thereof and the admission of appellant's liability therefor. It is so ordered.

HUMPHREYS, MEHAFFY and BUTLER, JJ., dissent.

BUTLER, J., (dissenting). I confess that much of the evidence, if not indeed the preponderance, sustains the conclusion reached by the majority that the wounds causing the death were self-inflicted. But there are other circumstances which cast doubt upon this and which, under our settled rules of practice, I think sufficient to constrain us to uphold the finding of the jury. In the first place, the letters of September 1st and 2d, written by the deceased to his fiance are confessedly the strongest evidence tending to establish suicide, but it will be noted that, although the letter of September 2d was written on the evening of that day and in that letter the writer stated that he would kill himself that night, he did not in fact do so—neither that night, the next day, nor the night following. Notwithstanding that declared intention, he was actively engaged all the day following in the discharge of his duties, and two nights and a day passed before he was killed. Men frequently express the intention of doing something and then fail to carry that intention into execution. Therefore the jury might have reasonably concluded that, in as grave a matter as the taking of one's own life, where the intention is not carried speedily into execution and there is a reasonable lapse of time, the deceased might have reconsidered.

It is argued in the majority opinion that no one could have entered the room in which the deceased was found dying. I think the testimony does not show that fact conclusively, and, while the doors were closed, they were not fastened in such a manner as to necessarily indicate that they were fastened immediately before the killing, for the door leading into the alley might well have been fastened by one departing from the room and pulling it to after him. The fact that the deceased had two bullet wounds in his head, one of which, according to practically the uncontradicted testimony, would have rendered him unconscious, and the other that would cause immediate and complete paralysis, might have led

the jury to believe that the deceased could not have fired both shots and that therefore he fired neither. Certainly, if the wounds were self-inflicted, the one that entered the brain and caused instant and complete paralysis could not have been fired before the bullet which entered the outer layers of the skull and fastened against "the second table" of the skull. There is abundant testimony to show that this last-mentioned bullet produced such a shock as to render the deceased profoundly unconscious, and, notwithstanding the testimony of the experts who stated that this unconsciousness would not endure longer than five minutes, the jury, from the testimony of others and judging the wound and its consequences in the light of common sense, might have reasonably inferred that the unconsciousness endured for a longer time and that the deceased could not have fired the shot into his brain which killed him.

Only one witness testified that there were any powder burns on the face or forehead of the deceased, and his statement was not a positive one. There were nine witnesses, all of whom made examinations immediately after the discovery of the body of the deceased, and all stated that there were no powder burns or discolorations from powder on the face or forehead of the deceased. A number of witnesses testified that, from their observation and experience, powder burns would appear where the pistol was held against the forehead or within eighteen inches of it at the time the pistol was fired. One witness experimented on the body of a freshly plucked fowl by firing shots into its body with a pistol muzzle pressed against it and from six to eighteen inches away, and he testified that each of the shots caused powder burns to appear on the body of the fowl. There was some testimony that a pistol fired with the muzzle touching the forehead would not leave any powder burns, but this was strongly disputed.

Another significant fact appearing from the evidence was that the pistol which was taken from the hand

of the deceased was examined by two witnesses on the same day of the killing; and one of these witnesses appears to have been a disinterested witness. He testified that he examined the pistol by looking down its barrel with a white paper placed at one end and by this means could see down the barrel. He stated that there were rust stains for a part of the way and the remainder was bright, and those familiar with the use of firearms testified that this condition would not appear if the pistol had been recently fired.

The deceased was found lying on his back, and, as one of the wounds caused instant and complete paralysis, he must have been in that position when the shots were fired. Both shots went "straight in," and one who experimented testified that in order for the wounds to have been self-inflicted the pistol must have been held in a most awkward and unusual manner. Another circumstance was that when found the deceased lay upon his back with his hand naturally grasping the pistol and lying upon his stomach. It was argued that if he fired the shot that caused immediate and complete paralysis, his hand would have fallen by the force of gravity on his breast, and this the jury might have inferred.

When it is remembered that there is a strong presumption of law against suicide and that fact must be affirmatively shown by direct proof, or from circumstances from which no other reasonable inference could be drawn, and when the further rule is borne in mind that we are irrevocably committed to the doctrine that we will not interfere with verdicts supported by any substantial evidence, and in arriving at whether the verdict is supported by substantial evidence the strongest probative force will be given to the testimony and every reasonable inference deducible therefrom in favor of the party receiving the verdict, I must respectfully dissent to the conclusions of the majority and to the order of reversal and dismissal.

I am authorized to say that Messrs. Justices HUMPHREYS and MEHAFFY join in this dissent.