ANCIENT ORDER OF UNITED WORKMEN OF KANSAS *v.* DUENSING.

4-4419

Opinion delivered June 29, 1936.

*Chrisp & Nixon,* for appellant.

*Wm. C. Gibson, W. A. Leach* and *Ingram & Mohr,* for appellee.

BUTLER, J. Dr. Theodore C. Duensing died from the effect of pistol shot wounds sustained about 3:10 p. m. on June 28, 1935. At the time of his death he was insured in the appellant order in the sum of $3,000, the beneficiary being Anna F. Duensing, the appellee. The policy was in full force and effect at the time of Dr. Duensing's death, and this action was instituted by the beneficiary against the appellant to recover for the death of the insured.

The policy provided that, if the insured committed suicide within two years from its date, whether he were sane or insane, the only liability should be for an amount equal to the contributions paid to the order. This stipulation was pleaded as a defense to the action on the theory that the insured had committed suicide. The trial resulted in a verdict and judgment in favor of the appellee for the amount sued for. From that judgment is this appeal.

Dr. Duensing was killed near Belleville, Illinois, while on a passenger train en route from Memphis to St. Louis in a vestibule between a day coach and a Pullman immediately to its rear. The sole ground urged for reversal is that the undisputed evidence establishes appellant's affirmative defense and, therefore, the verdict of the jury is without substantial evidence to support it. This contention is based upon the testimony of Edward Flannigan and Charles R. Peters, special agents of the Illinois Central Railroad.

The effect of the testimony of Mr. Flannigan is that he first saw Dr. Duensing when he (the witness) was boarding the train. The doctor was standing upon the steps of the day coach holding to the grabirons on each side and leaning with his head out of the vestibule. The conductor was heard to say something to Dr. Duensing and to Smoky Allen. The witness did not understand

what Allen said, but did hear the doctor say, "No, I wouldn't do anything like that—I have too much sense." When the doctor said this he stepped back, and witness passed into the day coach and took a seat. The doctor came into the same coach and sat down some two or three seats to the rear of the witness and across the aisle from him. This occurred while the train was at its station stop and Charles Peters, a fellow officer of Flannigan, got on the train just as it started to pull out and entered the same coach with witness and the doctor. The conductor, with whom witness appeared to be on friendly terms, soon came in, and while he and witness were standing in the aisle talking together, in the language of the witness, the following occurred: "I heard two shots fired in the back end of the coach. I turned and there was a pause of a few seconds and I heard some one holler he was killing himself. I ran to him, and as I was running down the aisle he was standing between the two coaches. He put the gun to his breast, looked down at it and shot three shots into his breast, and fell on his back." The train was headed north and, describing the point where the tragedy occurred, the witness said: "It happened on the north end of the coach south of the day coach." This was the Pullman immediately to the rear of the day coach. Continuing, the witness said, "I was about fifty feet, I guess—forty or fifty feet—when he shot the first two shots. I didn't see very much." Witness stated that when he heard the first shots he ran down the aisle in that direction and met a negro man running toward him. The day coach door was open and the door to the Pullman was closed. When witness reached the doctor he was dead and a pistol was lying beside him near his right hand. Witness picked up the pistol and handed it to Mr. Peters who was there "a second after I was." Witness described the pistol as a Smith & Wesson squeezer hammerless of the revolver type carrying five cartridges, all of which had been exploded when he picked it up and examined it before handing it to Mr. Peters. This weapon required pressure to be exerted on the handle before the trigger could be pulled or the cylinder revolved.

The testimony of Flannigan tends strongly to sustain the defense of suicide and would be conclusive on this question if it were consistent in its entirety and if there were no circumstances in evidence or testimony tending to conflict with it. *St. Louis-San Francisco Ry. Co.* v. *Harmon,* 179 Ark. 248, 15 S. W. (2d) 310.

Mr. Peters testified in effect that when he boarded the train and started through the car he heard three shots fired in rapid succession and saw Flannigan run that way. Witness followed Flannigan, and when he reached the rear end of the coach the doctor was lying dead on the platform within the vestibule. He was on his left side, "all doubled under." The body was just a few inches from the left hand door of the vestibule which was about three feet from its center, and a pistol was lying close to the right shoulder a little way from the neck. As Flannigan ran down the aisle with witness following, when the former had reached a point a little beyond the center toward the rear of the coach, he met a negro who was running up the aisle in the opposite direction. This negro appeared to be badly frightened and was coming from the platform of the day coach toward which witness and Flannigan were running. After the negro passed Flannigan he fell into a seat before witness reached him. Witness stated the negro's name is Walter Owen and at the time of the testimony he was living in St. Louis, his name and address both being known to witness at the time of the death of Dr. Duensing. Witness further stated that he saw the negro and Flannigan meet in the aisle at about the time the three shots were fired; that when he heard the shots and started running down the aisle he didn't know what had happened. After describing the position of the doctor's body and the location of the pistol with reference to it, the witness testified that a brakeman who had arrived on the scene, a Mr. Dipple, reached over, picked up the pistol and handed it to him. The witness described how the passageway between the two cars was formed to the effect that a platform extends a short distance from each car and they are joined together. On each side of these platforms are doorways with steps which can be let down

and, when these are raised and the doors are closed, the platforms are level. There are curtains made of canvas which are part of the vestibule. When witness reached the body he made an examination of the vestibule and found the doors closed so that the space between the two cars was inclosed, except for a door which opened into the day coach from which he had come. In testifying as to the condition of the vestibule, Mr. Flannigan had stated in answer to questions propounded on cross-examination that he did not remember whether or not the passageway between the two coaches was open, that it generally was, but "there is a curtain in there" and he could not say whether this curtain was open or closed at the time of the tragedy.

It will be seen that there are conflicts in the testimony of the witnesses, Flannigan and Peters, as to material facts and inferences which may be drawn from the testimony of Peters tending to render the accuracy of the statements of Flannigan doubtful. It will be remembered that Flannigan testified that he saw the doctor fire the last three shots. Peters, who was immediately behind Flannigan, stated that he did not see the shots fired because Flannigan was in his way. By the same token, Flannigan's vision was bound to have been obscured by the negro who was running toward him down the narrow passageway between the seats. According to Flannigan, the doctor must have died immediately and without a struggle, and if Peters is correct as to the location of the body it might reasonably appear that Flannigan could not have seen Dr. Duensing when the last three shots were fired even though the frightened negro had not been in his way. There are further contradictions in the testimony of Flannigan and Peters; the location of the pistol with relation to the body and who picked it up; Flannigan says one thing and Peters another. Flannigan stated that the pistol lay by the right hand of the deceased and that he picked it up, examined it, and handed it to Peters, while the latter says that the pistol lay near the right shoulder of the body near the neck and that it was one Dipple who picked it up and gave it to him.

The circumstances as narrated by Peters and the conflict between his testimony and that of Flannigan raise a doubt as to the accuracy of Flannigan's testimony which may be indulged without reflecting upon the integrity of the witnesses, for nothing is more certain than that human perception and memory is far from infallible. When we consider the strong instinct of self-preservation which exists in all sentient creatures and finds its highest example in man, the doubt as to the testimony of Flannigan becomes stronger. This instinct is generally recognized by the text writers and the courts, and is said to create a presumption against suicide even where the proof shows that death is self-inflicted. *Grand Lodge A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742. This presumption was recognized and applied by this court in a number of cases; notably among these are *Eminent Household of Columbian Woodmen* v. *Matlock,* 144 Ark. 126, 221 S. W. 858, and *Guardian Life Ins. Co.* v. *Dixon,* 152 Ark. 597, 240 S. W. 25.

In the Matlock case, Mrs. Matlock was heard talking to her husband in pleading tones by a near neighbor, and at this time Matlock fired a shotgun at his wife, severely wounding her. He immediately walked out of the room in which the shooting occurred. Almost instantly the gun was heard to fire again and Matlock was found with his chin and face shot away and the gun, a double-barrel shotgun, lying parallel with his body. There was nothing in the testimony indicating that Dr. Matlock had contemplated suicide. This court was of the opinion that the theory of suicide appeared to be more probable than any other. Under the circumstances of that case, the court affirmed the judgment of the lower court, holding that the death of Matlock was not as a matter of law the result of suicide on the ground that the question of probability was one properly submitted to the jury.

In *Guardian Life Ins. Co.* v. *Dixon,* 152 Ark. 597, *supra,* the testimony was to the effect that Dr. Dixon had an altercation with a Mr. Vaughan in the office of Mr. Burkhart, an attorney, and in the presence of a Mr. Buchanan. Without warning, Dr. Dixon

drew a revolver and shot Vaughan, who fell to the floor insensible. Burkhart led Dr. Dixon out of the room and entered a connecting office for the purpose of telephoning. He heard a shot and, turning in an instant, saw Dr. Dixon falling to the floor. Buchanan, who had remained in the room where Vaughan had been shot, testified that after Burkhart had led Dr. Dixon out of the door, he came back into the room, looked down for a moment at Vaughan lying on the floor, then placed the pistol to his head and shot himself, immediately falling dead with his face on the floor. This court, in affirming the judgment of the lower court against suicide, noticed the settled rule of practice against disturbing a verdict on appeal unless it appears to be against the uncontradicted evidence and every reasonable inference deducible therefrom. The circumstances in the Dixon case tending to dispute the testimony of eye-witnesses to the tragedy were also noticed by the court. Among these was the fact that no powder burns appeared near the location of the wound which was thought to be significant, although from the testimony it appeared that the pistol was loaded with smokeless powder which would not cause powder burns. Certain bruises were found on the head and face of the deceased which might have been explained by his falling on the floor. A person in a room underneath that where the shooting occurred, immediately before the shots were fired, heard some noise in the room above from which testimony the jury might have inferred that there was "a scuffle of some kind going on in the room" before the third shot was fired. There was also some testimony tending to show that Buchanan had testified at the coroner's inquest somewhat differently from his testimony at the trial. The court observed that the testimony of Buchanan and Burkhart was not so consistent with itself that it overcomes the circumstances tending to contradict it. The court stated its conclusion as follows: "We cannot say, as a conclusion of law, that the evidence is not legally sufficient to support the verdict, when viewed in the light of all the surrounding circumstances and the presumption against self-destruction. Where reasonable men may differ as to the legal suffi-

ciency of the evidence, the jury, and not this court upon appeal, must determine the issue.''

We are of the opinion that in the instant case the circumstances tending to cast doubt upon the accuracy of the testimony of Flannigan and against the theory of suicide are much stronger than those in the Dixon case to which we have just referred. In that case, Dr. Dixon was in an embarrassed financial condition which led to the altercation between himself and Vaughan, and a motive might be found for suicide in the horror with which he viewed his hasty act and the despair which must have been present in his mind when he looked at his victim. In the case at bar no motive appears, which is always a cogent circumstance tending to refute a suicidal intent. There is not the slightest intimation in the evidence to indicate the presence of the thought of self-destruction in the mind of Dr. Duensing. It appears that he was a doctor with a satisfactory practice, no financial difficulties, of temperate habits and a jovial disposition. One of his patients testified that on the day before his death he was in his usual cheerful mood, and a barber who shaved him while he was making preparation for the journey testified to the same effect. He left Stuttgart for St. Louis by way of Memphis and while in Memphis, not more than three hours before his death, he sent a friend in Stuttgart a telegram asking him to put up a sign that he would be back on the following day at noon.

More significant than lack of motive, however, is the weapon which caused the death of the doctor. No proof was made that it belonged to the doctor or that he had ever had one of similar character in his possession. On the contrary, his own pistol was found in his traveling bag, an unloaded thirty-eight caliber revolver, and also a number of cartridges of that caliber. Something had occurred between the doctor and Smoky Allen just previous to the shooting. Just what it was Flannigan did not know, but it was sufficient to cause the interference of the train conductor and for the doctor to remark, ''No, I wouldn't do anything like that. I have too much sense.'' The conductor, who was an available witness, was not called, and what Smoky Allen said was not heard by

Flannigan. Where Allen went and what he did is not shown by any testimony. It is within the realm of probability that it might have been another's pistol and another's act which caused the death of Dr. Duensing. There was one person also who perhaps knew more about how, and by what agency, the pistol was fired than any one else, that is, the negro, Walter Owen, whose residence was known and who appellant did not see fit to call to testify.

Still more important, as tending to negative the theory of suicide, are the number and location of Dr. Duensing's wounds and their probable effect when first inflicted. As tending to support appellant's theory there was the testimony of Flannigan and Peters that the doctor's clothing and wounds on his body were powder burned. On this phase of the case there is some dispute. Other witnesses who examined the body found no indication of powder burns at the location of the wounds. It is argued by counsel for appellant that the absence of powder burns on the body, when viewed by appellee's witnesses, was because of the embalmer's art. There was no testimony offered, however, that such was the case. But, if it be admitted that there were such marks on the clothing and wounds, from their nature and location the jury might have reasonably inferred that the shots were not self-inflicted. Flannigan was a police officer of many years experience, familiar with the use of firearms and the location of the heart within the human body. He testified as to its position that if a straight line was drawn downward from the chin a portion of the heart would be on each side of that line and that Dr. Duensing's wounds were in the breast at the location of the heart, all five of which could be covered by the palm of the hand. Peters testified to the same effect as to the location of the wounds, stating that they could be covered with a playing card which measures about 2½x3"; that there were two wounds on the right of the middle line of the breast about an inch apart, three on the left slightly less than an inch apart, the distance between those on the left and those on the right was from an inch to an inch and a half, and "they could all have been covered with a

playing card.'' From this evidence it seems reasonably certain that all five of the bullets pierced the heart of Dr. Duensing. It is true, a physician called as an expert witness for the appellant testified that the heart could be pierced without any serious immediate effect; that it is possible for a person shot through the heart to live for some time; that if the pneumogastric nerve is hit it is possible for that person to live for days; that according to witness' literature there are many cases where a person shot through the heart recovers, one case where a man lived seven days with two bullets through his heart, and another where a man was shot ten times through that organ without being killed, but the doctor admitted that a bullet striking the heart would have a tendency to knock one down and "might shock him." The jury had the right to weigh this testimony in the light of the common experience of the race, which doubtless it did. Opposed to the testimony of this expert witness is the testimony of a witness who was expert in the use of firearms and, at the time of testifying, was an instructor in that art, and had been such in the army. He testified that he was familiar with the effect of wounds in the vital organs, and that where one was shot with a thirty-eight caliber pistol in the location as testified to by Flannigan and Peters that the arm would fall to the side and could not be raised again; that a bullet from a pistol of the character described would have an impact equivalent to a force of 181 ft. pounds and would require a minimum pressure on the handle of ten pounds before the cylinder would revolve and trigger act; that to raise the arm and exert such a pressure would have been impossible after the first two shots had been fired. It will, therefore, be seen that the testimony of Flannigan to the effect that he saw the doctor deliberately fire the last three shots into his breast was not conclusive, but was a question for the jury under all the facts and circumstances.

In a number of cases we have held the evidence therein sufficient to conclusively establish intentional self-destruction, notably the cases of *Ætna Life Ins. Co.* v. *Alsobrook,* 175 Ark. 523, 299 S. W. 744, chiefly relied on by appellant in the case at bar; *Fidelity Mutual Life*

*Ins. Co.* v. *Wilson,* 175 Ark. 1094, 2 S. W. (2d) 80; *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569, 243 S. W. 831. In the Watters case there seem to have been no circumstances tending to refute the theory of suicide, and in the other cases, including the two last-above cited, a motive for suicide appears, either for shame and fear of disgrace, over-mastering despair or from melancholia induced by intemperate habits or disease. In the instant case all these elements are lacking and, when all of the circumstances are considered and the legal presumption against suicide indulged, we think the case was properly submitted to the jury, and the judgment should be affirmed. It is so ordered.