BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES
*v.* PAGE.

4-5260                                             123 S. W. 2d 536

Opinion delivered January 9, 1939.

*J. J. Jarnan* and *Huie & Huie,* for appellant.

*N. A. McDaniel, Ben M. McCray* and *Jehu J. Crow,* for appellee.

SMITH, J. Judgment was rendered in the court below upon an insurance policy for the amount thereof. Death by suicide was a risk not insured against, and the sole question presented on this appeal is whether the insured had committed suicide. There is no substantial conflict in the testimony in this case. It was all given by the family and friends of the insured, and is to the following effect: Insured had been an employee of a railroad company for a number of years. His health failed in August, 1935, and he quit work for a while for treatment, but returned to work for the railroad com-

pany in January, 1936, when, on account of continued sickness, he gave up his job. He did no work after that time, and was worried and nervous. His section foreman testified: "Well, he was worrying about his financial condition and being out of work. He was worried quite a bit about that." This foreman had told the insured that he would have to go to the hospital, and that he would not be able to work any longer, and insured did no work after that time. Shortly thereafter, and a few days before his death, insured was taken to the State Hospital for Nervous Diseases for examination. Nothing appears in the record as to the result of, or the report upon, this examination.

On May 12, 1936, insured and his wife, the beneficiary of the policy, went to visit his daughter in Benton, Arkansas, and arrived there about two o'clock in the afternoon. Insured went to the room assigned to him in his daughter's house, and remained there. His wife left and went to town. After his wife departed insured requested his daughter to get him a drink of water, and she went to the well a short distance from the house to do so, when returning with the water, she heard a noise in the house, and was told by a passerby that it was a gun shot. She hurried into the house, and found her father in a dying condition, lying on the floor, with his head resting against the wall, and a discharged pistol lying on the floor a short distance from his right hand and about two feet from his body. The insured lived only a short time and did not regain consciousness. The pistol belonged to the daughter of insured, and had been left on a shelf in a corner of the room, which was about three feet above the floor. The pistol was easy on the trigger, according to the daughter's testimony, and would go off from a jar or the slightest touch of the trigger.

It may be stated with entire certainty that the insured killed himself, either accidentally or intentionally. The thought that he may have been murdered has not been suggested, and it is inconceivable that any member of the jury should have entertained even a suspicion that the devoted daughter had killed her father, and no one else had the opportunity to do so.

How, then, did the insured kill himself? Appellee makes this answer: "It is as reasonable to assume that deceased was examining the pistol, when it was accidently discharged, or that he was overcome by one of his falling spells (to which he was subject), and in attempting to steady himself by grabbing at the shelf on which the pistol lay, caused its accidental discharge, as to assume that he deliberately placed the gun to his head and took his own life."

We do not think these theories can be accepted with any show of reason, or that they would be seriously considered, if this were not a controversy between a bereaved widow and an insurance company. The undisputed testimony is to the effect that deceased was not examining the pistol when his daughter left him to get the drink of water, and the fatal shot was fired during her short absence. The daughter testified that the pistol was "on a shelf in a corner of the room he was in," but the undisputed testimony is to the effect that the body was not found near the shelf nor in that corner of the room. The coroner testified that appellee had stated at the inquest that insured had been seen weeping on the day of his death, and while that testimony is denied, there appears to be no question but that insured was in the depths of utter despair on the very day of his death, on account of his physical and financial condition.

When the daughter returned hurriedly from her mission for her father, she found him lying on the floor, with his head resting against the wall, and the pistol lying on the floor a short distance from his right hand, which was outstretched. There was a mirror hanging on the wall to the left of the door, and the bottom of the mirror was about five feet above the floor, and to the right of the mirror were some splotches on the wall that looked like blood. Insured's feet were some two or three feet from this wall and almost directly in front of the mirror, and his body was lying at an angle out from the mirror.

The coroner testified that "The wound was practically halfway between the ear line and the top of the head, just a fraction of an inch to the rear of the median

line going to the ear." He further testified that he probed the wound, and that the bullet was still in deceased's head, and had ranged downward. He testified also that there was evidence of powder burns on the deceased's head. Appellee's brief concedes the truth of these facts, but states that "There were very few powder burns around the wound." The significant fact is not the extent of the powder burns, but, rather, the fact that there were powder burns above or behind the ear at the place where the bullet entered.

It must be conceded that we have a number of cases, of very tenuous character, affirming verdicts apparently finding that the insured had not committed suicide, in which the evidence greatly preponderated to the contrary. But we have always recognized the fact that the legal sufficiency of the testimony to support such a verdict was a question of law for the court. *Catlett* v. *St. Louis, I. M. & So. Ry. Co.*, 57 Ark. 461, 21 S. W. 1062, 38 Am. St. Rep. 254.

In the following cases the jury had found that the insured had not committed suicide: *Industrial Mutual Indemnity Co.* v. *Watt*, 95 Ark. 456, 130 S. W. 532; *New York Life Ins. Co.* v. *Watters*, 154 Ark. 569, 243 S. W. 831; *Ætna Life Ins. Co.* v. *Alsobrook*, 175 Ark. 523, 299 S. W. 743; *Fidelity Mutual Life Ins. Co.* v. *Wilson*, 175 Ark. 1094, 2 S. W. 2d 80; *Home Life Ins. Co.* v. *Miller*, 182 Ark. 901, 33 S. W. 2d 1102.

We reversed each of those cases, for the reason that, in our opinion, there was no reasonable conclusion which could be drawn from the testimony recited in those opinions except that death had been caused by suicide, notwithstanding the verdicts of the jury to the contrary. A comparison of the facts stated in those opinions—which we shall not pause to make—will show that in none of them was it more certain that the insured had committed suicide than in the instant case. It is, therefore, our duty, when, in our opinion, there is no reasonable view of the testimony except that the insured had committed suicide, to reverse the judgment pronounced upon the contrary finding by the jury.

The cases above cited and others on the subject have recognized the case of *Grand Lodge A. O. U. W.* v. *Banis-*

*ter,* 80 Ark. 190, 96 S. W. 742, as our leading case on the subject, and all subsequent cases have professed to follow the principles of law there announced, in the application of which some judgments have been affirmed, while others have been reversed. That case and all others announce the proposition—which we here reaffirm—that "There is a presumption against suicide or death by any other unlawful act, and this presumption arises even when it is shown by proof that death was self-inflicted— it is presumed to have been accidental until the contrary is made to appear." But no case has ever held that this presumption was conclusive and might not be overcome by testimony. Nor has any case ever held that the testimony must be that of eye-witnesses. It is, on the contrary, a matter of common knowledge that suicide is usually committed with as much secrecy as possible, and could be but rarely shown, except by proof of the facts and circumstances attending its commission.

In the case of *Fidelity Mutual Life Ins. Co.* v. *Wilson, supra,* we quoted with approval from 14 R. C. L. 1236-7 the following statement of law on this subject: "The presumption against suicide will stand and be decisive of the case until overcome by testimony which shall outweigh the presumption."

We think the undisputed testimony and the physical facts outweigh this presumption and leave no reasonable doubt but that the insured committed suicide.

The judgment must, therefore, be reversed, and as the cause appears to have been fully developed, it must be dismissed. It is so ordered.

HUMPHREYS, MEHAFFY and BAKER, JJ., dissent.

HUMPHREYS, J. (dissenting). This suit was brought in the circuit court of Saline county by appellee against appellant to recover $500 as a designated beneficiary out of a death benefit fund maintained by appellant to pay a designated beneficiary of one of its members who should die in good standing unless the death of said member occurred by suicide or the use of alcohol.

The answer filed by appellant admitted that R. L. Page, the husband of appellee, was a member of its organization in good standing from the year 1919 to the

day of his death, May 12, 1936, and that appellee was his designated beneficiary; but denied any liability to her for the reason that its constitution and by-laws provided that if deceased met his death by suicide no benefits would be paid and alleged that R. L. Page, deceased, met his death by suicide.

The cause was submitted to a jury upon the issue joined of whether R. L. Page committed suicide under the evidence adduced, resulting in a verdict for appellee for $500, from which verdict and consequent judgment is this appeal.

At the conclusion of the evidence appellant requested the court to instruct a verdict for it, which the court refused to do, over appellant's objection and exception.

Appellant contends for a reversal of the judgment on the sole ground that the evidence is insufficient to support the verdict.

The evidence, stated in the most favorable light to appellee is, in substance, as follows: R. L. Page had been an employee of a railroad company for a number of years. His health failed in August, 1935, and he quit work for a while for treatment, but went back to work for the railroad company in January, 1936; but on account of continued sickness gave up his job. He did not work after that time and was worried and nervous. About a week before his death he went to the state hospital for nervous diseases for examination. Nothing appears in the record as to the result of the examination. On May 12, 1936, he and his wife, the appellee herein, went to visit his daughter in Benton, Arkansas, Mrs. Jim Mormon, and arrived at her home about two o'clock in the afternoon. He remained in his room and his wife went down town. He requested his daughter to get him a fresh drink of water and she went to the well a short distance from the house to do so. When returning with the water she heard a noise in the house and was told by a passerby that it was a gun shot. She hurried in and found her father in a dying condition lying on the floor with his head resting against the wall and a discharged pistol lying on the floor a short distance from his right

hand and about two feet from his body. She took hold of his shoulders and laid his body down on the floor and then called for help. He lived only a short time and did not regain consciousness. The pistol belonged to the daughter of deceased and had been left on a shelf in a corner of the room which was about three feet from the floor. It was easy on the trigger and, according to the testimony of his daughter, would go off from a jar or the slightest touch of the trigger. There were a few powder burns near the wound in his head. The ball had entered about halfway between the right ear of deceased and the top of his head and was slightly to the rear and the ball according to the probe made took a downward course. The ball remained in his head. There was a mirror hanging on the wall to the left of the door resting on a shelf about five feet from the floor and one witness said there were some splotches on the wall to the right of the mirror that looked like blood. No examination was made to ascertain whether the splotches were blood splotches. There was no evidence of a struggle and deceased had his clothes on, but no hat. The body was lying at an angle out from the mirror and no one was in the room when it was entered by the daughter with the water which she had brought for her father. The coroner who had been sent for testified that appellee and her daughter stated that deceased was nervous and had cried at some time during the day. The daughter denied that she told the coroner her father had cried. There is no evidence in the record showing that appellee was in financial straits or that during his illness he had ever threatened suicide. The deceased had never seen the pistol or handled it before entering the room. The deceased was given to having spells, but the record is silent as to the nature of them save that of his foreman who said when he had spells he would "fall out." Just what the foreman meant by "falling out" is not clearly revealed. Appellant says that the witness meant to say that he would quit work, but it might have meant that he would fall down when he had one of these spells. Just what interpretation the jury put on this piece of testimony is not for this court to say.

The legal presumption is against the theory of suicide and the presumption is such a strong one that this court has said in the case of *Grand Lodge of the A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742 (quoting syllabus No. 3), that: "The presumption against suicide or death by a wrongful act arises even where it is shown by proof that death was self-inflicted; it being presumed that death was accidental until the contrary is made to appear." The court also said in the case cited that the burden of proving that one committed suicide is upon the one alleging that fact and also that if men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute it became a question for determination by the jury and not by the court. These declarations of law run through many subsequent cases decided by this court and will be found thus announced in the cases of: *Industrial Mut. Indemnity Co.* v. *Watt,* 95 Ark. 456, 130 S. W. 532; *New York Life Insurance Co.* v. *Watters,* 154 Ark. 569, 243 S. W. 831; *Mutual Life Insurance Co. of New York* v. *Raymond, et al.,* 176 Ark. 879, 4 S. W. 2d 536; *New York Life Insurance Company* v. *Redmon,* 191 Ark. 1003, 88 S. W. 2d 324; and *Ancient Order of U. W. of Kansas* v. *Duensing,* 192 Ark. 919, 95 S. W. 2d 900. In most of the cases mentioned above in applying the declarations of law announced the question of intentional self-destruction was held to be a question for determination by the jury.

Appellant's theory of the instant case is that the deceased had a motive for killing himself and that in order to accomplish his purpose he took the pistol off the shelf in the corner of the room and walked to the mirror so that he might see what he was doing and placed the point of the pistol near his head about halfway between his ear and the top of his head and just to the rear of a line between his ear and the top of his head, pulled the trigger and killed himself. They based their conclusion that he was standing in front of the mirror on the fact that some splotches supposed to be blood were on the wall just to the right of the mirror and because his body was found lying face up with his head and shoulders against the opposite wall and his feet extending in the

direction of the mirror. The trouble with this theory is that the splotches on the wall were not proven to be blood splotches and because the bullet took a downward instead of an upward course. It is mere surmise or speculation under the evidence to say that the splotches on the wall were blood from the man's body and it is extremely doubtful that under the circumstances the bullet would have taken a downward course instead of an upward course. In order to explain the course the bullet took appellants say that it must have struck some bone or hard substance that deflected the upward course that it would naturally have taken. Whether it struck such a substance is speculation pure and simple. The evidence is entirely circumstantial as to whether appellant killed himself intentionally or accidentally. This court said in the case of *Mutual Life Insurance Company of New York* v. *Raymond, et al.,* 176 Ark. 879, 4 S. W. 2d 536, that "there is a presumption of law against a man taking his own life intentionally, even where it is shown that he came to his death at his own hands, the law presuming that the death was accidental rather than suicidal." It may be that the deceased took the pistol off the shelf for the purpose of examination and that in some way it went off accidentally and killed him. The jury might have found that after picking the pistol up and while examining it he had one of his spells and in falling to the floor he threw his hand up in the direction of his head at which time it fired and accidentally killed him. There were only a few powder burns near the wound and they might have been found there even if the deceased accidentally killed himself.

In the first place there is very little evidence tending to show any motive for suicide. The deceased was not in financial straits. He was simply out of a job which is the case with many men. He was ill, but nothing to show that he was incurable and nothing to show that he ever threatened to take his life or had any intention of taking his life before his death. The physical facts do not point unerringly and with certainty to a suicide.

It is argued that he remained in his own room, but this is not an unusual thing for a man feeling badly to do.

It is argued that he was alone in the house after his wife went down town and after he asked his daughter to go to the well and get him a drink. It is quite probable that he was thirsty after being in the house as long as he was and that his real purpose was to get a cool drink of water instead of getting his daughter out of the house so that he would be alone. The probability is that if he had been overly nervous or very sick his wife would not have gone down town and his daughter would not have gone out of the house even to draw a bucket of water. There is nothing in the entire record that indicated this man had planned prior to his death to take his life and the motive assigned for the act is so slight that it is hardly appreciable. I think the facts and circumstances in this case are not sufficient to overcome the legal presumption against sane persons committing suicide and to meet the burden of proof resting upon appellant to show that he did commit suicide, and hence, this court should not say as a matter of law that he did commit suicide. I think under the facts and circumstances in the instant case that men of reasonable intelligence might honestly draw therefrom different conclusions on the question of whether the deceased committed suicide or whether he killed himself accidently and, in view of this conclusion, I think it was proper to submit the issue to the jury for determination and, as there is substantial evidence in the record to support the verdict of the jury, the court should affirm the judgment instead of reversing it and dismissing the case.

Mr. Justices MEHAFFY and BAKER authorize me to say they concur in my views and this dissenting opinion.