. CENTRAL STATES LIFE INSURANCE COMPANY *v.* MCELWEE.

4-5688 133 S. W. 2d 881

Opinion delivered December 4, 1939.

*A. D. DuLaney* and *J. Ford Smith,* for appellant.

*Ross Mathis* and *W. J. Dungan,* for appellee.

SMITH, J. Appellant insurance company issued a policy September 1, 1928, upon the life of Franklin S. McElwee, with a provision for double indemnity, ''In the event of the death of the insured by bodily injury effected exclusively by external, violent and accidental means, . . . .'' The insured died November 25, 1937, as the result of being fatally wounded by four or five pistol shots between 2 and 4 a. m. during the night of November 24, 1937. Proof of death was made, and the face of the policy was paid, but the double indemnity was refused upon the ground that insured had committed suicide. The policy provided that ''This agreement to pay a double indemnity does not cover death by suicide, whether sane or insane, nor does it cover death resulting from riding in any aerial vehicle.'' The question for decision is, therefore, whether the insured had committed suicide.

This issue of fact was submitted to the jury under instructions to several of which exceptions were saved by the insurance company. We do not consider the objections to the instructions for the reason that, in our

opinion, the undisputed testimony establishes the fact that the insured committed suicide. From a verdict and judgment in favor of the beneficiary named in the policy is this appeal.

There is a presumption of law against suicide, and here that presumption is re-enforced by the verdict of the jury; but the question at issue has not been concluded by this presumption of law and the verdict of the jury.

The law of the subject was fully stated in the very recent case of *Brotherhood of Maintenance of Way Employees* v. *Page,* 197 Ark. 498, 123 S. W. 2d 536, and no useful purpose would be served by its restatement. In the opinion in that case it was said:

"It must be conceded that we have a number of cases, of very tenuous character, affirming verdicts apparently finding that the insured had not committed suicide, in which the evidence greatly preponderated to the contrary. But we have always recognized the fact that the legal sufficiency of the testimony to support such a verdict was a question of law for the court. *Catlett* v. *St. Louis, I. M. & So. Ry. Co.,* 57 Ark. 461, 21 S. W. 1062, 38 Am. St. Rep. 254.

"In the following cases the jury had found that the insured had not committed suicide: *Industrial Mutual Indemnity Co.* v. *Watt,* 95 Ark. 456, 130 S. W. 532; *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569, 243 S. W. 831; *Aetna Life Ins. Co.* v. *Alsobrook,* 175 Ark. 523, 299 S. W. 743; *Fidelity Mutual Life Ins. Co.* v. *Wilson,* 175 Ark. 1094, 2 S. W. 2d 80; *Home Life Ins. Co.* v. *Miller,* 182 Ark. 901, 33 S. W. 2d 1102. We reversed each of those cases, for the reason that, in our opinion, there was no reasonable conclusion which could be drawn from the testimony recited in those opinions except that death had been caused by suicide, notwithstanding the verdicts of the jury to the contrary."

The testimony in this case was given by the friends and acquaintances of McElwee, the insured, and their sympathy for the beneficiary is made evident by a study of their evidence. But we must—and we do—give to this testimony its highest probative value insofar as it

tends to support the verdict. It is to the following effect.

The insured, at the time of his death, was serving as night marshal and watchman in the town of Augusta. He enjoyed the respect and confidence of his acquaintances. All the witnesses testified that he was a man of great determination and unquestioned personal courage. The sheriff of the county testified that McElwee was one of the best officers he had ever worked with. For more than a year prior to McElwee's death, he had been afflicted with arthritis, from which disease his suffering at times was very great. For a time he carried his left arm in a sling on account of this disease. As a World War veteran, he received treatment one or more times in hospitals, both in Memphis and in Hot Springs, where he received some relief. He had been discharged and had just returned from the hospital at Hot Springs after a stay there of two months, and had resumed his duties as night marshal. for which he was paid a salary of $50 per month. This salary was supplemented by small fees paid him by certain merchants as a night watchman. Before returning from the hospital he had written a letter of inquiry about obtaining a filling station which he had formerly operated, thus indicating the intention and the ability to re-engage in that employment. He does not appear, however, to have made this arrangement, and he had been employed for several days as night marshal. He stated to one of his friends the night before he was shot that he believed his trouble was coming back on him, and that but for his wife and children he would end it all. Similar remarks to other friends indicated his apprehension about his condition.

The witness in best position to know most about the circumstances under which McElwee was shot was Morgan Jones, in front of whose house the shooting occurred. This witness was in bed when he heard a pistol shot, and, when asked the number of shots he had heard, the witness answered, "I couldn't be positive, about 5, I think." Asked what next attracted his attention, witness answered, "Well, I got up and looked out

of the window, I saw nothing, and went back to bed for just long enough to get back in bed, and heard another shot." He again went to the window and saw a man lying on the sidewalk in front of his house. He made a fire, and went to the house of Jack Goad, a neighbor. The sheriff was telephoned for from Goad's house to meet them at the street corner. When asked, "About how much time had elapsed from the time you 'phoned him (the sheriff) until he (the sheriff) got there?", witness answered: "I guess fifteen minutes." It was about 7 feet from witness' steps to the sidewalk. The sidewalk was about 3½ feet wide, and the body of McElwee was found on the street side of the walk. Upon finding McElwee, witness went for Dr. McGuire. Witness was not sure, but he thought 5 shots were fired, they were not fired "one right after the other, there was a minute or two between the shots." Witness was not sure, but he thought he saw a man across the street, in the shadow of a garage, but he did not hear or see that man fire any shot. He knew McElwee well, and when the sheriff asked McElwee who had shot him, McElwee answered, "I did it, myself."

The testimony of Goad substantially corroborates that of Jones after Jones came to his house, except that he did not hear the conversation between McElwee and the sheriff. When Goad was asked, "About how long was it before the sheriff got there?", Goad answered: "I presume 15 or 20 minutes—10 minutes anyway." The pistol was 2 or 3 feet from McElwee's body, but witness could not say whether it was in reaching distance from his body.

It was admitted that the pistol was one which McElwee carried, and that it was a double-action revolver, which could be fired only by pulling the trigger. It was not an automatic pistol.

The sheriff of the county testified that it was 20 minutes of 4 when he was called, and that he went at once to the residence of Jones, in front of which he saw the body of McElwee lying on his left side, with his overcoat pulled up over his head. The night was cold.

The witness identified the pistol as one which McElwee carried. It was a 32-30 Smith & Wesson. The cylinders carried 6 cartridges, but he knew that McElwee always carried the gun with its hammer on an empty chamber. This witness knew McElwee well as a man of great courage and determination, and could not believe that such a man would shoot himself, and he, therefore, thought that some one else had shot McElwee, so he asked McElwee who had shot him. The exact testimony of this witness was: "Q. Did you have any conversation with him? A. Only I asked him who did it. Q. What was his reply? A He said he did. Q. Did you ask him why he did it? A. No, sir. Q. Did he give any reason why? A. No, sir."

Further testifying, the sheriff stated there was no evidence of a scuffle or struggle, and, when asked, "Mr. Sheriff, did you conduct any investigation of the matter further?", he answered: "No, sir."

There was one empty chamber and five empty shells in the pistol. Witness identified an overcoat offered in evidence as the one worn by McElwee, and in regard to his coat the sheriff gave the following testimony: "Q. You said the overcoat was over his head, do you mean it was thrown back over his head, or how? A. It being cold I imagine he pulled it up over his head himself, it was pulled up like this. Q. He still had it on? A. Yes, sir, but he had it over his head."

The undertaker who embalmed the body testified that there was a powder burn on the chest of the deceased, and another powder burn on the edge of the hair on his forehead.

Dr. McGuire was insured's family physician, and responded to the call for his services. When he arrived, insured had been removed to the home of the witness Jones. The doctor testified that there were 3 bullet holes in the lower quadrant of the left chest. One shot narrowly missed the heart. The 3 shots could have been covered by a circle having a diameter of 3 or 4 inches. There was a burn on the upper chest, that looked like a bullet burn. Asked if he saw a bullet hole in deceased's

hat, the doctor answered, "If I remember right it was in the brim of the hat and right near the front part of the crown of the hat there were two holes," but he could not tell whether they had been made by one bullet or not.

After giving first aid treatment in the home of witness Jones, the doctor called an ambulance and sent insured to the hospital in Searcy, where he died at some hour during that day not disclosed by the record.

The doctor stated that "McElwee's mind seemed to be very clear," but the insured was badly shocked and was suffering. Before administering an opiate, the doctor asked McElwee who had shot him, and McElwee answered, "I did it."

Guy Willis, engaged in the cleaning and pressing business, had cleaned and pressed McElwee's overcoat. The overcoat was produced by this witness, and he was asked to run a pencil through the holes in the coat. He stated there were either 4 or 5 holes through the left side. "There is one there, and there is one, and there is one. Three is what I have found so far. It seems to me there was more than that, there is the fourth one down there, there is the fifth one, five holes in the coat."

We think no reasonable view of this testimony can be taken except that McElwee died by his own hand. The theory that he may have shot himself accidentally is preposterous. No reasonable mind could conclude that McElwee shot himself accidentally five times, at intervals of a minute or more.

The only other theory refuting suicide is that some one shot him, and the only testimony lending any support whatever to that theory is that given by the witness Morgan Jones, and Willis, the cleaner and presser. Jones said he thought—but was not certain—that he saw a man standing in the shadow of a garage across the street. It does not appear whether the garage was directly across the street or not, but Jones did not testify that he saw or heard any shot fired from the direction of the garage. There was no quarrel or scuffle and no outcry when McElwee was shot. It would have been

a wonderful exhibition of pistol shooting for one in the dark shooting across the street to have placed three shots within a circle having a diameter of 3 or 4 inches; but this was not a physical impossibility. It was, however, impossible for those shots to have powder burned McElwee's forehead and cheek. Now, the presser testified that he found 5 holes in the coat, and there was at least one bullet hole in the hat, and McElwee only fired 5 shots. We quote the testimony of the presser. One of the attorneys for appellee put on the coat, and the presser was asked to show where the bullet holes were. "Q. Now, Mr. Willis, demonstrate very briefly on Mr. Dungan about where the bullet holes went in? A. All I can tell is where the holes in the coat are. Q. That is what I mean, show where they go in? A. There is one of the holes and there is another one right there. Q. Right over the left arm demonstrating? A. Another one down there under the left arm. Q. The third one is under the left arm about how far down. A. Six inches. Q. That is three, then where are the other two? A. There is one of them right there toward the front. Q. That is the fourth one? A. Yes, sir. Q. Where is the fifth one you found? A. I don't seem to find the fifth one now. Q. At any rate, you say there were four holes immediately under the left arm. A. Yes, sir."

The testimony of the presser, just quoted, shows that he found three holes readily in the coat, but the other two were not so easily found; in fact, he appears to have failed to find the fifth hole. There appears to be no explanation of the facility in finding three of the holes, and the difficulty in finding the other two, if all had been made by bullets. It would appear that the holes would be approximately the same size. One of the bullets, according to this witness, was over the left arm, another under the left arm, and a third hole six inches farther down. The doctor's testimony was to the effect that all three of the wounds on the body could have been enclosed in a circle the diameter of which was 3 or 4 inches. Admittedly, McElwee's pistol had been fired five times, when his cartridges were exhausted, and that

is the number of shots which the witness Jones (in front of whose house the shooting occurred) testified that he heard.

The testimony affords no sufficient basis for the reasonable conclusion either that McElwee shot himself accidentally or was shot by some other person.

The judgment must, therefore, be reversed, and as the case appears to have been fully developed it will be dismissed.