St. Louis Southwestern Railway Company, Henwood, Trustee, *v.* Stone.

4-7669                                    187 S. W. 2d 903

Opinion delivered June 4, 1945.

*Shaver, Stewart & Jones,* for appellant.

*Rowell, Rowell & Dickey,* for appellee.

ROBINS, J. A trial jury awarded appellee $2,000 damages for bodily injuries sustained by him in collision between a freight locomotive and appellee's automobile at Main Street crossing in Pine Bluff, Arkansas, on January 14, 1944. For reversal of judgment entered on the jury's verdict appellant urges: (I) That the verdict was contrary to the evidence, in that the proof failed to show that appellee's injury was caused by negligence of appellant but showed that the collision was caused by appellee's negligence in driving on the track in the face of an approaching locomotive, and that the lower court erred in refusing to give appellant's instruction No. 1, which was peremptory instruction in favor of appellant. (II) That the lower court erred in giving instructions Nos. 3 and 9, requested by appellee, and instructions A and B

given on the court's own motion, and in refusing to give appellant's requested instructions Nos. 2 and 5.

## I.

Appellee in his complaint alleged that the collision was caused by the negligence of appellant's flagman in signaling appellee to proceed over the crossing at a time when the flagman knew or should have known that a train was approaching. Appellee alleged other grounds of negligence on the part of appellant, which he asserted contributed to his injuries, but these were abandoned in the trial. The only theory of negligence on the part of appellant submitted to the jury was that based on the alleged negligence of the flagman in giving appellee a signal to proceed. Appellee alleged that by reason of the collision his automobile was damaged to the extent of $250, that his right knee was fractured and that he received other painful bodily injuries. The answer was a general denial of the allegations of the complaint and a plea of contributory negligence.

The jury in their verdict specifically found against appellee as to damage to automobile, although it was stipulated that it had been damaged to the extent of $100 in the collision.

Appellee, who was an employee in the coach department of appellant, testified that as he approached the crossing at about 7:30 p.m. driving north on Main Street, he saw Hollis, the flagman, signaling him to stop; that Hollis was using a regular switchman's lantern, with electric battery, giving a white light; that the flagman was facing south, and when appellee saw the signal he slowed down and was getting ready to stop, going at a speed of 5 or 10 miles an hour; that the flagman then turned east, looking down the track toward a switch engine which was on a "house track" a short distance east of the crossing and headed toward the crossing. "Then he gave me a signal to come on across. He turned facing the switch engine and gave me the signal in front of him, which is a come-on signal to come on across. . . . The signal given me when he was facing south

was in front of him. It wasn't way down that way
(indicating). The usual signal is up in front of your
waist. He turned facing the switch engine when I got
down close and gave me the same signal, which means to
come on across. I had slowed down to 5 or 10 miles an
hour and had the car out of gear getting ready to stop
and put on the brakes, and he gave me the second signal
and I put my car in second and came on across. I heard
a bell ringing, but I thought the bell was on a switch
engine. I took him at his word for my safety and de-
pended solely on him. Prior to that I looked to the right
and left, both, best as I could. I couldn't see very good
there on account of the sides of my glasses were kinda
frosted up. I figured, well, he knew what he was doing,
and when he signaled the thing was all right I come
ahead. When I first saw the 800 engine coming on the
main line going east I was about 15 feet of the main line.
The 800 engine was going about 20 or 25 miles an hour. It
looked like it was coming mighty fast to me. It looked like
its headlight was dim to me. It might have been because
I was looking through that glass, it might have had
something to do with it. My glass was kinda frosted.
From my side glass it looked mighty dim to me. When I
first saw the engine I didn't have time to stop. By the
time I got off the gas and on the brake I was almost onto
him—just a few feet there, and the only thing left for
me to do was try my best to miss him. I turned right. I
got on the track first. Right front of the engine hit my
left fender. The flagman asked if I was hurt. I told him
I didn't know whether I was hurt or not. I asked him
why he didn't flag me to stop and he said he did flag
me, and I said, 'Yes, your first signal was for me to stop,
but your last signal was for me to come on.' . . .
Hollis [some time after the collision] told me he got
excited and he didn't know whether he gave me the stop
signal or not."

Hollis, the flagman, testified: "Just before the acci-
dent I was flagging for the switch engine that was down
in the house track. I saw Stone's car as it approached
the crossing. I was standing between the passing track
and the main line and it was sleeting and snowing and I

heard this 800 coming out of the south. A man was going south on Main. I took my light and waved it like that, and turned around and Mr. Stone was coming north on Main, and I just done him that way, and I turned and looked east and just give my light like that, and he come ahead, and his left front fender hit the pilot step. Engine No. 817 hit Stone's car. It was traveling about 5 to 6 miles an hour at the time of the accident. The headlight was burning. I couldn't say if it was on bright or dim. But I did see it was burning. It was bad weather; sleeting and snowing. Pavement was covered with ice and slippery. At no time did I give Stone a signal to cross the crossing. At all times I gave him a signal like that—a stop signal. The car driven north on Main did not stop in response to my signal. That was Stone's car. The car traveling south stopped in response to my signal. I do not know why Stone did not heed my signal and stop. When he kept on coming across the crossing, I stepped back out of the way. Because I didn't want to get run over. I seen he wasn't aiming to stop and I just stepped back. I hollered at him. He did not heed the hollering at him in any way. I just hollered there was an 800; of course the windows were up and I couldn't tell whether he heard me or not. I couldn't tell if there was anything to have kept Stone from seeing the lights from this 800 coming, had he looked in the direction in which it was approaching. If the side glasses on his car had been down he could have seen the 800 engine coming. I don't know anything about the condition of his car. I don't know whether his lights were up or down. If his lights were down, there was nothing to have kept him from seeing the engine. I was flagging him all the time to stop, and hollered at him, and he drove on in front of the engine which was traveling somewhere between 5 and 8 miles an hour. Another switchman, who was off duty, was standing close by. He saw the accident. When Stone got out of his car he asked why I gave him a signal to come across and I told him I didn't, I gave him a stop signal, and he said, 'I took it to be a come-ahead signal.' I gave him a stop signal. It was the usual and customary signal given by a train switchman, and members of the train

crew, to stop. . . . Q. *You knew the 800 was coming?*
A. *No, sir, I didn't* know it at the time. Q. Why? A. Well,
I heard him ringing the bell. I knew the 800 was coming,
but I didn't know it until he rung his bell. I wasn't
looking for his headlights. I was south of the passing
track switch before the 800 showed up to where I could
hear it.'' Hollis was to some extent corroborated by
Ragland, head brakeman on the train pulled by engine
817, which struck appellee's car, by Dorough, a switch-
man, Martin, engineer on this locomotive, and Blocker,
a citizen of Dumas.

Pomeroy, brakeman on the freight train involved,
testified that the train was moving slowly and after the
train stopped he talked with appellee. ''Stone remarked
that he didn't see the train approaching. He didn't say
anything about the man giving him the signal to come
across. Hollis asked me what was a stop signal and I
told him. He said, 'that is what I was giving that man.'
At night, it is to wave a lantern across in front of your
body.''

This case was submitted to the jury on proper in-
structions as to contributory negligence, and also on the
rule as to comparative negligence as laid down in § 11153
of Pope's Digest of the laws of Arkansas. The jury's
verdict indicates that the jury found that appellee was
guilty of some degree of negligence, because they found
in the verdict that appellee was not entitled to recover
for damage to his automobile. In other words, since they
found in favor of appellee for his bodily injuries, in a
less sum than that asked by him, and found against him
on his claim for damage to his automobile, it must be
assumed that the jury found that both parties were negli-
gent, but that the negligence of appellant exceeded that
of appellee. The jury saw these witnesses and heard them
testify. They had the opportunity (which we do not
enjoy) of seeing the witnesses make manual demonstra-
tion as to how traffic signals should be correctly given
and how the signal was actually given by the flagman
just before the collision. We have frequently held that
on appeal the testimony should be given the strongest
probative effect in favor of the party in favor of whom

the verdict is rendered and that a verdict should not be set aside when there is any substantial evidence to support it. *Home Life Ins. Co.* v. *Miller,* 182 Ark. 901, 33 S. W. 2d 1102; *M. P. Rd. Co.* v. *Fowler,* 183 Ark. 86, 34 S. W. 2d 1071; *M. P. Rd. Co.* v. *Sandifur,* 183 Ark. 196, 32 S. W. 2d 316; *Mosley* v. *Raines,* 183 Ark. 569, 37 S. W. 2d 78; *Republic Mining & Mfg. Co.* v. *May,* 184 Ark. 786, 43 S. W. 2d 742; *Missouri Pacific Railroad Company* v. *Barron,* 196 Ark. 244, 117 S. W. 2d 15.

Applying this rule to the evidence in the case at bar, we conclude that there was substantial testimony to support the verdict; and the lower court did not err in refusing to give a peremptory instruction in favor of appellant.

## II.

Appellant argues that the court erred in giving instructions Nos. 3 and 9, requested by appellee, pertaining to comparative negligence, for the reason, as appellant urges, no negligence on the part of appellant was shown by the evidence.

The testimony of appellee to the effect that the flagman signaled appellee to "come on" made a question for the jury in this case. It was the jury's province to determine whether this testimony was true, and, if so, whether, under the circumstances, appellant was guilty of negligence. In 44 Am. Jur., p. 771, it is said: "A flagman signaling to a traveler to come on, when the circumstances are such as require him not to signal, or to signal for further waiting, is guilty of negligence in the performance of his duty. Furthermore, his warning must be given in time to enable the traveler to avoid injury by the exercise of reasonable care; an insufficient or delayed warning by a flagman may constitute negligence. Ordinarily, it is for the jury to say where the flagman was and what he did, and whether he gave an efficient warning to the person injured."

Appellant also argues that its requested instruction No. 2 should have been given. This instruction directed the jury to return a verdict in favor of appellant if they found that Hollis flagged appellee as appellee approached

the tracks and appellee did not heed the warning. The substance of this instruction was contained in the last sentence of instruction B given on the court's own motion as follows: "On the contrary, if you find that no such signal was given, or if you believe from the evidence that such a signal was given, but that a person approaching the crossing exercising ordinary care for his own safety would not have interpreted such signal as meaning that he should attempt to cross the track, you will find for the defendant."

The court also gave the following instructions requested by appellant:

"Instruction No. 3. You are instructed that a railroad track is, at all times, a constant warning to all persons approaching said track and intending to cross the same; and it is the duty of the persons approaching a railroad track in an automobile to look and listen for the approach of trains; and to continue on their guard of looking until the danger is past; and if such persons see the train approaching, or could by the exercise of due care on their part, see a train approaching in time to avoid an accident, but nevertheless go upon the track in front of the train and are struck thereby, they are held in law to be guilty of contributory negligence, and if you find from a preponderance of the evidence in this case that W. C. Stone was negligent in failing to stop his automobile before it collided with the defendant's train, and that such negligence, if any, on the part of W. C. Stone was the sole, proximate cause of the accident, then your verdict should be for the defendant, provided you further find that the defendant, its agents, servants and employees were guilty of no negligence."

"Instruction No. 4. You are instructed that the defendant railway company is not liable for damages to the plaintiff unless the defendant or its employees were guilty of negligence which caused the collision; that is to say, unless the defendant or its employees failed to use ordinary care, which means such care as an ordinary prudent person would use under the same or similar circumstances; and if you believe from the evidence that the

railway company and its employees used ordinary care in the flagging of said crossing, then your verdict should be for the defendant.''

We conclude that the instructions given by the lower court properly presented to the jury the law applicable in this case. The judgment of the lower court is affirmed.